UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| DANIEL P. CORBETT, | ) |
| AS GUARDIAN OF | ) |
| BRIAN CORBETT | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION NO: 1:22-CV-11474-LTS |
| vs. | ) |
| | ) |
| STEVIE BROWNING, *et al*, | ) |
| | ) |
| Defendants. | ) |

_____ )

**Plaintiff's Opposition to Defendant Massachusetts**
**State Police's Motion to Dismiss Pursuant to Fed.R.Civ.P 12(b)(6)**

**I.      Introduction**

The Defendant Massachusetts State Police ("State Police") has moved to dismiss Count III

of the Amended Complaint alleging a violation of Title II of the Americans with Disabilities Act

("the ADA") and the Rehabilitation Act. The State Police make the following arguments for

dismissal: (1) the ADA does not permit a claim for damages against the State Police on a theory of

vicarious liability; and (2) even if there is vicarious liability, Plaintiff has failed to state a claim under

either the "effects" or "accommodation" theories—the two potential avenues for liability under the

ADA.[1]

---

[1] In a footnote, Defendant also argues that a Section 1983 claim cannot be brought against a state entity.
Defendant makes this argument because the title portion of Count III erroneously includes "42 USC 1983"
prior to "ADA." This is a "scrivener's" error. The allegations in the subsequent paragraphs of Count III do
not refer in any way to a §1983 claim. While the State Police argue that Count III should be dismissed
because a claim under §1983 is not cognizable against the State Police, they appear to acknowledge that
Count III should be treated as a claim under the ADA, and not §1983. (*See* Def. Memo., fn.2 ("To the extent
Plaintiff instead intends to bring a claim directly under the ADA…"). In any case, if it is necessary, Plaintiff
requests leave to amend the complaint to delete "42 USC §1983" from title portion of Count III.

As set forth below, Defendant's Motion should be denied. *First,* as Defendant acknowledges, the First Circuit has not decided whether there is vicarious liability under Title II, and there is a circuit split on the issue. Defendant's suggestion that there is a recent, evolving consensus that such liability is *not* available is not accurate. Courts in several circuits consistently allow for vicarious liability claims under Title II. Moreover, those courts that hold that there is no vicarious liability under Title II of the ADA rely upon the Supreme Court's opinion in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), which is a case analyzing Title IX of the Education Amendments of 1972, not Title II of the ADA, and there are significant reasons not to follow *Gebser*. But even if this Court were to side with those circuits holding that vicarious liability is not available, the facts in the Amended Complaint sufficiently state a claim, at least at this early stage, for direct liability against the State Police under the standard in *Gebser*. As set out below, that standard which requires knowledge by an "appropriate person" is met in the present case.

*Second,* Plaintiff's allegations state a claim under the ADA under both the "effects" and "accommodation" theories. The Plaintiff has Down Syndrome and was having a tantrum on account of soiling himself while riding in his father's truck. His father was attempting to calm him down when police arrived and aggravated the already difficult circumstances. The plaintiff was not committing any crime, and his behavior was a direct manifestation—i.e., "effect"—of his Down Syndrome. The state police troopers on scene were aware of Plaintiff's disability but nonetheless continued to aggravate the situation by threatening to "Tase" Plaintiff, continuing to advance, and failing to heed his father's pleas to stand back. In other words, the officers failed to accommodate Plaintiff's obvious disability in violation of Title II of the ADA.

## II.  Statement of Facts

The Plaintiff Brian Corbett ("Brian") suffers from Down Syndrome. (Amend. Compl. ¶ 14).[2] The condition includes developmental, cognitive and behavioral symptoms. *Id.* At four feet eleven inches tall Brian functions and appears as a child, despite the fact he was twenty-nine years old at the time of the incident. (Amend. Compl. ¶ 15). Brian has limited communication skills and requires assistance with everyday functioning. *Id.*

Brian soiled himself while driving with his father, Daniel, on January 12, 2021, causing Brian great distress. (Amend. Compl. ¶¶ 16, 18). His father pulled over in the breakdown lane where there was a sidewalk so he could help Brian. (Amend. Compl. ¶ 18). Daniel also called Brian's mother Cheryl to come and assist. (Amend. Compl. ¶ 19). Daniel knew that Cheryl could calm Brian. (Amend. Compl. ¶ 20).

After his father pulled over his truck, Brian began removing his soiled garments. (Amend. Compl. ¶ 21). Daniel attempted to persuade Brian to get back in the truck. (Amend. Compl. ¶ 22).

Soon thereafter, Massachusetts State Police Trooper Stevie Browning ("Browning") pulled over in front of Daniel's truck and approached. (Amend. Compl. ¶ 23). He asked if Daniel needed help and was told he did not. (Amend. Compl. ¶ 25). Daniel told the Trooper that Brian's mother was on the way to help and she would be able to diffuse the situation. (Amend. Compl. ¶ 26). Trooper Browning did not heed Daniel's request. Instead, he escalated the situation. He threatened to use his Taser on Brian. (Amend. Compl. ¶ 27). Daniel now had to divert his attention from helping Brian to respond to Browning's potentially deadly threat. Daniel explained that Brian has a congenital heart condition related to his Down Syndrome, for which he recently received open-heart surgery. (Amend. Compl. ¶ 28). Daniel was fearful that the jolt of electricity from use of a Taser could kill

---

[2] The First Amended Complaint (Doc. 35) is hereafter referenced as "Amend. Compl. ¶ __".

Brian. *Id.* The Trooper still did not back down. (Amend. Compl. ¶ 29). Browning's aggressive stance further exacerbated the already difficult situation. *Id.*

Additional Troopers soon arrived. (Amend. Compl. ¶ 30). Instead of listening to what Brian's father knew was needed—the police to back off and to wait for Brian's mother—Browning ordered the other Troopers to take Brian to the ground where he was placed in handcuffs, causing abrasions to Brian's knees and pain to his shoulder. (Amend. Compl. ¶¶ 31-32, 37). An ambulance arrived and the troopers placed Brian on a gurney and into the ambulance, still in handcuffs. (Amend. Compl. ¶ 33). Brian's mother, Cheryl Corbett arrived, but was not permitted to intervene. (Amend. Compl. ¶ 34). Browning threatened to arrest Brian on "assault" charges against Daniel. (Amend. Compl. ¶ 35). The Troopers had the ambulance take Brian to Salem Hospital, but neither of his parents were permitted to ride with him in the ambulance. (Amend. Compl. ¶ 36).

The incident had a significant effect on Brian. (Amend. Compl. ¶ 38). The fear and anxiety caused by the Browning and the other Troopers caused Brian to stop wanting to leave his home or ride in a car. (Amend. Compl. ¶¶ 43, 44). As a result, he stopped working his job at the local Registry of Deeds, stopped accompanying his father to work, and stopped attending his day program. (Amend. Compl. ¶¶ 44, 45, 47).

### III. Legal Argument

#### A.  Standard of Review

"Dismissal of a complaint pursuant to Rule 12(b)(6) is inappropriate if the complaint satisfies Rule 8(a)(2)'s requirement of 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (quoting Fed. R. Civ. P. 8(a)(2)). "A 'short and plain' statement needs only enough detail to provide a defendant with 'fair notice of what the…claim is and the grounds upon which it rests.'" *Id.* (quoting

*Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).  "However, in order to 'show' an entitlement to relief a complaint must contain enough factual material 'to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" *Id.*  "'Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "In short, an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." *Id.*

"In resolving a motion to dismiss, a court should employ a two-pronged approach. It should begin by identifying and disregarding statements in the complaint that merely offer 'legal conclusion[s] couched as…fact[]' or 'threadbare recitals of the elements of a cause of action.'" *Id.*, citing *Ashcroft, supra*, at 1949-1950 (additional citation omitted). "A plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." *Id.*, citing *Ashcroft, supra*, at 1950. "Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible. *Id.* at 12, citing *Ashcroft, supra* at 1951. "If that factual content, so taken, 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' the claim has facial plausibility." *Id.* (quoting *Ashcroft, supra*, at 1949). "The make-or-break standard…is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, cause for relief."  *Id.* (quoting *Sepulveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010)).

### B.  Title II of the Americans with Disabilities Act

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Gray v. Cummings*, 917 F.3d 1, 14 (1st Cir. 2019), citing 42 U.S.C. § 12101(b)(1). Title II of the ADA "broadly provides that 'no

qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' *Id.*, citing 42 U.S.C. § 12132. The term "public entity" includes "any State or local government" as well as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* at 15.

      **C.  This Court Should Follow the First Circuit's Assumption in *Gray* that Vicarious Liability is Available Under Title II, the District Court Decisions in this Circuit that Have Followed *Gray*, and the 4th, 5th and 9th Circuits that Consistently Allow Vicarious Liability Claims Under Title II of the ADA.**

      As noted above, there is a Circuit split on whether vicarious liability is available under Title II of the ADA, and the First Circuit has not decided the issue. When it arose in *Gray v. Cummings*, the Court chose to abstain and to avoid "plung[ing] headlong into… murkey waters." 917 F.3d 1, 16 (1st Cir. 2019). Instead, the *Gray* Court assumed there was vicarious liability without deciding the issue. Several district courts in this Circuit have either followed suit—*see* e.g., *Chase v. City of Bangor,* 2021 WL 1396277, *7 (D.Me. Apr. 13, 2021) (adopting assumptions made in *Gray*); *Lambert v. Town of Merrimack,* 2019 WL 1333309, *5 (D.N.H, Mar. 25, 2019) (same); *Lewis v. Spurwink Services,* 2022 WL 17454078, *4 (D.Me. Dec. 6, 2022) (allowing case to proceed on theory of vicarious liability)— or expressly held that vicarious liability is available. *See Fortin on Behalf of TF v. Hollis School District,* 2017 WL 4157065, *6 (D.N.H. Sept. 18, 2017) (holding there is vicarious liability under Title II).

      Notwithstanding these decisions, Defendant suggests that there is an evolving consensus that vicarious liability is not viable under Title II of the ADA. (*See* Def. Memo., p. 5). The Circuit Courts of Appeals that hold that there is no vicarious liability under Title II of the ADA rest principally upon the Supreme Court's decision in *Gebser, supra,* a decision written twenty-five years ago. If determinative of the issue, the supposed "consensus" would have been reached at this point. Moreover, Defendant's suggestion is belied not only by the in-Circuit decisions cited above, but also

by decisions in the 4th, 5th, and 9th Circuits, which consistently allow Title II vicarious liability claims. *See Seremeth v. Board of County Com'rs Frederick County,* 673 F.3d 333, 339 (4th Cir. 2012); *Estate of LeRoux v. Montgomery County Maryland, 2023 WL 2571518, *11 (D. Maryland S. Div., March 20, 2023); Windham v. Harris County, Texas,* 875 F.3d 229 (5th Cir. 2017); *Duvall v. County of Kitsap,* 260 F.3d 1124, 1141 (9th Cir. 2001); *Estate of Richard by Richards v. Remington,* 2023 WL 2503724 *3 (D.AZ March 14, 2023).

Finally, the Supreme Court made it clear in *City and County of San Francisco v. Sheehan,* 575 U.S. 600, 610 (2015), decided approximately seventeen years after *Gebser,* that the issue of vicarious liability under Title II of the ADA remained an open question. Unlike *Gebser,* a Title IX case, *City and County of San Francisco, Calif. v. Sheehan, 575 U.S. 600, 610 (2015)* concerned Title II of the ADA. In concluding that *certiorari* had been "improvidently granted," in that case the Court stated:

> Our decision not to decide whether the ADA applies to arrests is reinforced by the parties' failure to address a related question: whether a public entity can be liable for damages under Title II for an arrest made by its police officers. Only public entities are subject to Title II…. and the parties agree that such an entity can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees. But we have never decided whether that is correct, and we decline to do so here, in the absence of adversarial briefing.

*Id.* at 610. (Emphasis added).

It therefore appears clear that the Circuit decisions that rely on *Gebser* are questionable. As explained in the next section, there are significant reasons to reject that authority. First, *Gebser* involved Title IX of the Education Amendments of 1972, not Title II of the ADA. Significantly, Title IX is "Spending Clause" legislation, *see Gebser,* 524 U.S. at 287, unlike Title II, which was enacted pursuant to Section 5 of the Fourteenth Amendment. *See Buchanan v. Maine,* 469 F.3d 158, 171 (1st Cir. 2006). The driving rationale of *Gebser* concerns the contractual nature of Spending Clause legislation and its administrative remedies, considerations that do not apply to Title II. *See J.S.H. v. Newton,* 2023 WL 1451935, at *7 (D. Mass. Feb. 1, 2023) (noting the difference between

Spending Clause legislation and legislation enacted pursuant to Section 5 of the Fourteenth

Amendment).

### D.  There Are Significant Reasons to Reject the Rationale of Those Circuit Courts of Appeals Holding there is No Vicarious Liability Under Title II

The issue in *Gebser* was whether Title IX allowed for vicarious liability of a school for sexual

harassment committed by a teacher. *Gebser*, 524 U.S. at 277. The Court held that no vicarious liability

was available.  *See id.* at 290. To reach this conclusion, the Court considered first the express remedy

under Title IX. Title IX is Spending Clause legislation, which the Court characterized as essentially a

contractual framework between the recipient of federal funds and the government. *Id.* at 286. The

express statutory enforcement mechanism is thus administrative. *See id.* at 288. If a recipient fails to

effectuate the non-discrimination mandate of Title IX, the government can terminate its funding. *See
id.*

There is also an *implied* private right of action established by the Court for monetary damages

under Title IX, which was shaped in such a manner, as it must be, to not "frustrate the purposes" of

Title IX. *Id.* at 285. *See Cannon v. University of Chicago,* 441 U.S. 677 (1979) and *Franlin v. Gwinnett
County Public Schools,* 503 U.S. 60 (1992). The Court explained that an implied right of action must

not be "at odds with the statutory structure and purpose." *Id.* at 284.

The Court concluded that to allow an *implied* private right of action that allowed for vicarious

liability would be at odds with Title IX's *express* remedy, which requires the relevant federal agency to

provide notice to an "appropriate person" at the recipient of the federal funds concerning its failure

to comply with the nondiscrimination mandate. *See id.* at 288-289. The commencement of

enforcement proceedings may not take place "until the agency has determined that voluntary

compliance is unobtainable and 'the recipient ... has been notified of its failure to comply and of the

action to be taken to effect compliance….'" *Id.* at 288 (internal citations omitted). Inherent in this administrative remedy is actual knowledge on the part of the recipient-agency. *See id.* at 285.

A remedy involving vicarious liability by definition does not require actual knowledge on the part of an official of the recipient of the funds. Because of this, the Court concluded that the "*express* system of enforcement" which requires notice and "an opportunity to come into voluntary compliance" would be at odds with "a judicially implied system of enforcement [which] permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice." *Id.* at 289.

The rationale in *Gebser* leading to the conclusion that vicarious liability is not available is thus driven wholly by the fact that Title IX is Spending Clause legislation and the contractual nature of the relationship between federal fund recipients and the Government.

This rationale does not apply to Title II of the ADA, which is not Spending Clause legislation, but instead was enacted pursuant to Section 5 of the Fourteenth Amendment. It is not contractual in nature. Indeed, the Court in *Gebser* rejected the petitioner's attempt to analogize Title IX to Title VII on that very basis. *See id.* at 286 (the "contractual framework distinguishes Title IX from Title VII, which is framed in terms not of a condition but of an outright prohibition. Title VII applies to all employers without regard to federal funding and aims broadly to 'eradicat[e] discrimination throughout the economy.'"). Like Title II of the ADA, Title VII was also enacted pursuant to Section 5 of the Fourteenth Amendment. Several courts have observed that this critical difference between Title II and Title IX makes for a faulty analogue. *See* e.g. *J.S.H. v. Newton,* 2023 WL 1451935, *7 (noting in the context of Title III that the analysis in *Gebser*, which involves Spending Clause legislation should not apply to statutes enacted pursuant to Section 5 of the Fourteenth Amendment.)

**E.  Even if this Court Determines that *Gebser* Governs, the Facts in the
Amended Complaint Are Sufficient for a Claim of Direct Liability
<u>Against the State Police</u>.**

*Gebser* rejected vicarious liability under Title IX and held that "[b]ecause the express remedial

scheme under Title IX is predicated upon notice to an 'appropriate person' and an opportunity to

rectify any violation, we conclude, in the absence of further direction from Congress, that the

implied damages remedy should be fashioned along the same lines." At 290. "An 'appropriate

person'… is, at a minimum, an official of the recipient entity with authority to take corrective action

to end the discrimination." *Id.* This "appropriate person" does not have to be a policymaker of the

agency, as the Eleventh Circuit held in *Liese v. Indian River County Hosp. Dist.,* 701 F.3d 334, 349 (11th

Cir. 2012). There nurses and doctors refused to provide translation services to a patient. The Court

held that the doctors were at a sufficient level in the hierarchy to meet the *Gebser* "appropriate

person" standard, as "the doctors enjoyed complete discretion over whether or not to provide the

[Plaintiff] with an interpreter or other auxiliary aid." *Id.* at 350.

Police officers possess significant discretion. A reasonable inference from the facts alleged in

the Amended Complaint is that the troopers on the scene possessed the discretion to decide

whether to step back, not arrest, and wait for Brian's mother to arrive. They did not have to

physically restrain Brian and handcuff him. There is also a reasonable inference from the alleged

facts that the troopers called a superior officer for direction on what to do. The troopers on the

scene may have been granted the authority to make any decision they chose, which would likely

fulfill the *Gebser* standard of an "appropriate person." *See Ravenna v. Village of Skokie,* 388 F.Supp 3d

999, *20 (N.D. Ill June 7, 2019) (holding officer on scene was of a sufficient rank to satisfy standard

under *Gebser* for direct liability). Plaintiff has therefore sufficiently pled a direct violation of the

ADA.

**F. Plaintiff has Stated a Claim Under Both the "Effects" and the "Accommodation" Theories of Liability**

The State Police contend that Plaintiff's allegations fail to state a claim under the "effects" or "accommodations" theories of liability. The "effects" theory "holds that a violation may be found when 'police wrongly arrest[] someone with a disability because they misperceive[] the effects of that disability as criminal activity." *Gray*, at 15 (*quoting Gohier v. Enright,* 186 F.3d 1216, 1220 (10th Cir. 1999)). The "accommodation" theory "holds that a violation may be found when police officers 'properly investigated and arrested a person with a disability for a crime unrelated to that disability, [but] they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process then other arrestees.'" *Id. (quoting Gohier*, 186 F.3d at 1220-1221). The Amended Complaint alleges sufficient facts to satisfy both theories of liability.

### 1. "Effects" Theory

When the Defendant State Troopers arrived on the scene, Brian Corbett was in a panicked state due to soiling himself while driving with his father. He was attempting to remove his clothing on the sidewalk adjacent to the roadway, and his father was having difficulty getting him back into the truck. (Amend. Compl. ¶¶ 18, 21). The Amended Complaint further alleges that Brian's disability is obvious to any onlooker. (Amend. Compl. ¶¶ 14, 15, 35). He is four feet eleven inches tall, appears childlike, and was acting in a manner that made his disability obvious. If there was any doubt concerning Brian's disability, his father explained it to the Defendant Troopers on scene. (Amend. Compl. ¶ 28). It is sufficiently alleged, and there is no question, that Brian's behavior was a manifestation of his disability and that was understood by the Troopers.

In *Gray*, the Court stated that to prevail on the "effects theory" the Plaintiff would "at least have to show that [the officer] knew that [any alleged criminal conduct] was a symptom of her

mental illness rather than [conduct] []warranting criminal charges[].” *Gray*, 917 F.3d at 18. The alleged facts in the present case are more than sufficient to meet this threshold.

The decision in *Ravenna v. Village of Skokie,* 388 F.Supp 3d 999 (N.D. Ill June 7, 2019), is instructive. There the plaintiff was known to the police department as delusional. She had made repeated complaints to the police concerning her next-door neighbor that the police discovered were not reality based. *Id.* at 1002. At some point the police received a complaint from the neighbor alleging conduct that officers determined provided probable cause for plaintiff's arrest for disorderly conduct and officers carried out that arrest. The court, relying on the explanation in *Gray* of the “effects” and “accommodation” theories, held that “[a] reasonable jury could find liability… under both theories. There is evidence that [the entity defendant] understood [plaintiff's] actions to be the product of mental illness, not criminal activity. Thus, a jury could find for [plaintiff] on the ‘effects’ theory. *Id.* at 1009.

The State Police contend that the “effects” theory of liability is not adequately pled in this case because “conduct that is objectively criminal cannot form the basis of an ‘effects’ theory merely because the actor suffers a disability.” (Def. Memo at 9). The State Police's argument appears to be that Brian's conduct amounted to criminal activity thus disqualifying him from protection by the ADA. The criminal offense identified by the State Police appears to be an “assault” on Brian's father.

As the circumstances in *Ravenna* make clear, an officer may not ignore an individual's disability simply because it manifests as arguably criminal conduct. *But cf. Gohier,* 186 F.3d 1216 (10th Cir. 1999) (involving dangerous conduct that put officers at risk). The State Police's argument would create an exception to ADA violations—any technical criminal violation despite that it is a manifestation of a disability—that would likely swallow the rule. Peculiarly, the State Police's argument is also not based on the facts alleged in the Amended Complaint. Instead, the argument

refers to cherry-picked facts taken from the state court complaint and the original complaint in this court. (Def. Memo. at 9-10). For example, the State Police rely on a "fact" in the prior pleadings that Brian "fought with his father" and that the police justifiably arrested him for assault. Def. Memo. at 9). Those facts are then presented with inferences drawn, not in Plaintiff's favor, but in the Defendant's favor. Such reliance on these prior pleadings is inappropriate.[3]  The Court should therefore disregard the facts Defendant relies on that are outside the Amended Complaint. It should also be noted that the only mention in the Amended Complaint concerning an "assault" was that the officers threatened Plaintiff with that charge. (Amend. Compl. ¶ 35 ("Despite Brian's obvious disability and Daniel's protestations, Browning threatened to arrest Brian on "assault" charges against Daniel.").

Furthermore, the allegations in the Amended Complaint allege that the aggressive conduct of the troopers exacerbated Brian's conduct. If Brian's conduct morphed into criminality, a reasonable inference from the alleged facts is that the troopers' failure to act reasonably in the circumstances and to heed Brian's father's pleas to stand back caused the Plaintiff to further act out.

### 2.  *"Accommodation" Theory*

Under the "accommodation" theory, the State Police make two arguments. First, the State Police argue that "Plaintiff's allegations do not support the proposition that Brian suffered 'greater

---

[3] "It is well-established that an amended pleading supersedes the original pleading; facts not incorporated into the amended pleading are considered *functus officio*." *Kelley v. Crosfield Catalysts*, 135 F.3d 1202, 1204–05 (7th Cir. 1998); *see also Lubin v. Chicago Title & Trust Co.*, 260 F.2d 411, 413 (7th Cir.1958) ("It is hornbook law that an amended complaint complete in itself and making no reference to nor adopting any portion of a prior complaint renders the latter functus officio."). "If certain facts or admissions from the original complaint become *functus officio*, they cannot be considered by the court on a motion to dismiss the amended complaint. A court cannot resuscitate these facts when assessing whether the amended complaint states a viable claim." *Kelley*, 135 F.3d at 1205. The State Police argue that the Court may rely upon facts outside a pleading that are attached as exhibits or otherwise incorporated by reference. (Def. Memo. at fn. 11). However, the filing of an Amended Complaint decidedly *does not* incorporate by reference prior pleadings. *See Kolling v. Am. Power Conversion Corp.*, 347 F.3d 11, 16 (1st Cir. 2003) (amended complaint completely supersedes his original complaint, and thus the original complaint no longer performs any function in the case).

injury or indignity' in the process of being arrested than similarly situated individuals without Down's Syndrome." (Def. Memo., at 11). That is clearly not the case. The Amended Complaint alleges significant and lasting injuries that fundamentally altered Brian's life. (Amend. Compl. at ¶¶ 38-51). The second argument made by the State Police is that "Plaintiff has not pointed to a reasonable accommodation that the Trooper Defendants should have provided to Brian." (Def. Memo., at 11). That too is not the case. The Amended Complaint alleges that Brian's father asked the Troopers to stand back and wait for Brian's mother to arrive. (Amend. Compl. at ¶¶ 25-26, 31). Not engaging—especially in an aggressive manner—with a mentally disabled individual is a typical accommodation recognized by Courts. *See e.g., Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1233 (9th Cir. 2014), rev'd in part, cert. dismissed in part sub nom. City & Cnty. of San Francisco, Calif. v. Sheehan, 575 U.S. 600 (2015). It is also a matter of common sense. In the present case, the Troopers were in the unique situation of having the benefit of direct instructions on the necessary accommodations from Brian's primary caretaker.

In *Ravenna*, the court held that "a reasonable jury could find that [the entity defendant] policy requiring arrest for misdemeanor offenses, as applied to the misdemeanor disorderly conduct complaint against [plaintiff], exhibits deliberate indifference to [plaintiff's] disability. This case likely would have been avoided if [the entity defendant] had issued a summons rather than subjecting her to the alleged violence and indignity of arrest." *Id.* at 22-23. Analogously, in the present case, this lawsuit, and the significant damage done to Brian Corbett, would have been avoided if the Troopers had heeded Brian's father and waited a few minutes for the arrival of Brian's mother. *See also Sheehan*, 743 F.3d at 1233 (holding that a reasonable jury could find that officers were required to employ less confrontational tactics, including the accommodations the plaintiff alleged were necessary).

In *Gray* the Court stated that "to prevail on…the accommodation theory, [the plaintiff] would at least have to show that [the officer] knew that there was a reasonable accommodation,

which he was required to provide." *Gray* at 18. The Plaintiff has overwhelmingly met that standard in the present case.

### G.  <u>Sovereign Immunity</u>

Defendant State Police makes an immunity argument, in a footnote. (*See* Def. Memo,. fn.2).

Defendant contends that Plaintiff's ADA claim should be dismissed on the basis of Eleventh Amendment sovereign immunity. Defendant makes no further argument. Nonetheless, Defendant is mistaken. It is established that "Title II validly abrogates state sovereign immunity" where the conduct alleged "actually violates the Fourteenth Amendment." *United States v. Georgia*, 546 U.S. 151, 159 (2006). This argument is premature. "There is a protocol by which such Eleventh Amendment claims should be decided … before the immunity issue is reached, the court must first address whether plaintiff's Title II claim fails on the merits." *Buchanan v. Maine*, 469 F.3d 158, 172 (1st Cir. 2006). In assessing a claim of sovereign immunity, the "lower courts should determine ... on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* ( quoting *Georgia*, 546 U.S. at 882).

The State Police's one-sentence argument, in a footnote, does not adequately address these issues.

## Conclusion

For all of the above reasons, the Court should deny Defendant Massachusetts State Police's

Motion to Dismiss. Plaintiff requests a hearing on this Motion.

**Respectfully Submitted,**
Daniel Corbett on behalf of
Brian Corbett,
By his attorneys,


/s/ Jeffrey Wiesner
Jeffrey Wiesner, BBO No. 655814
Jennifer McKinnon, BBO No. 657758
Wiesner McKinnon LLP
88 Broad St., Suite 503
Boston, MA 02110
Tel.: (617) 303-3940
Fax: (617) 507-7976
jwiesner@jwjmlaw.com
jmckinnon@jwjmlaw.com

/s/ Karen A. Pickett
Karen A. Pickett, BBO No. 633801
Pickett Law Offices, P.C.
125 High St.,
26th Floor
Boston, MA 02110
617.423.0485
kpickettlaw@gmail.com


July 26, 2023

### CERTIFICATE OF SERVICE

I, Jeffrey Wiesner, certify that on the 26th day of July, 2023, a copy of the above pleading was filed with the ECF System and sent electronically to the registered participants identified on the Notice of Electronic Filing.

/s/ Jeffrey Wiesner
Jeffrey Wiesner