UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

JENNA FREEMAN, AS GUARDIAN )
OF BRIAN CORBETT, )
 )
Plaintiff, )
 )
vs. )          CIVIL ACTION NO: 1:22-CV-11474 - FTS
 )
STEVIE BROWNING, *et al.*, )
 )
Defendants. )
_____ )

**Plaintiff's Opposition to Defendants' Motion for Summary Judgment**

## I.    Introduction

Brian Corbett is a severely disabled individual with Down[1] syndrome. As a result of his condition, he has developmental, cognitive, and behavioral symptoms. Although an adult, Brian functions as a child and appears as one. His communication skills are limited. Prior to this incident, Brian loved to spend his days riding in his dad's truck, attending his day program, and working at his job performing simple tasks at the Salem Registry of Deeds.

On the day of the incident, Brian had a bathroom accident while riding as a passenger in his father's truck. This precipitated an episode of panic in Brian. His father, Daniel, pulled his truck over on Route 1 North in Danvers and both got out onto the sidewalk. Daniel tried to assist Brian, but Brian, in his elevated state, became combative with his father.

It is then that the first of the four State Police Defendants, Stevie Browning, arrived on the scene. Brian did not heed police commands. Ultimately the police forced Brian face down on the road, placed his arms in a compliance hold, held down his legs, and handcuffed him.

Brian suffered significant psychological injuries as a result of the treatment he received. Even years later, he continues to suffer from anxiety requiring medication and therapy. He is afraid to ride in a car and often refuses to leave his home. He has not returned to the job at the local Registry. While Brian is unable to describe what occurred to him, of the few thoughts he is able to express about the incident, one is: "no handcuffs."

Sadly, his father, Daniel, succumbed to illness before he could be deposed in this case. As a result, Plaintiff does not have the benefit of a counter-narrative to the defendants' story; Brian's limitations prevent him from explaining what occurred. Notwithstanding, even on the defendants' version of events, taken, as they must be, in the light most favorable to Plaintiff, the treatment Brian

---

[1] The National Down Syndrome Society's Preferred Language Guide eliminated the "'s" on "Down's".

1

received at Defendants' hands failed to accommodate Brian's very significant disabilities. These disabilities were obvious to the troopers, and Brian's father explained them on the scene.

In the end, this Court should hold that a reasonable jury could find—in violation of the Massachusetts Equal Rights Act ("MERA")—that in these unique circumstances Brian was owed the reasonable accommodation of officers waiting the few moments to allow for the arrival of Brian's mother and the ambulance and not being placed in a compliance hold and handcuffed face down and naked on the pavement. In addition, this Court should conclude that a reasonable jury could also find that officers used unreasonable and excessive force in their treatment of Brian in violation of the Fourth Amendment.

## II.    <u>Statement of Facts</u>

On the morning of January 12, 2021, Daniel Corbett was driving on Route 1 Northbound with his son and constant companion, Brian, by his side.[2] SOF 13.[3] Brian's condition, in addition to developmental, cognitive, and behavioral symptoms, also caused a congenital heart defect. RSOF 4. At four feet eleven inches tall and 130 pounds, Brian functions and appears as a child. He appeared as such to Defendant Browning. RSOF 4, 30. His communication skills are significantly limited and he requires assistance with his everyday functioning. RSOF 4.

Nevertheless, prior to the incident, Brian lived a well-rounded life. He attended a program for people with disabilities five days a week for six hours a day. RSOF 4. Before the incident, Brian was a "social butterfly" who loved to travel in the car with his family members on errands and for family events. RSOF 61. According to his mother and sister, any chance he had, he would go out with one of his family members, as he wanted to "be out socializing with people." RSOF 61. He

---

[2] As the family members share a surname, they will be referred to by their first names throughout.
[3] References to the Defendants' Statement of Facts are noted as "SOF [#]" and references to the Plaintiff's Responses to the Defendants' Statement of Facts are referenced as "RSOF [#]".

especially enjoyed riding in his father's truck. RSOF 61. Brian also had a job at the Essex Registry of Deeds that he performed with the assistance of a job coach from his day program. RSOF 61.

On this particular morning, Brian had an unexpected bathroom accident while Daniel drove north on Route 1. SOF 13. Route 1 North (from left to right) has two travel lanes, a breakdown lane, a sidewalk, then a guardrail. RSOF 12. Daniel pulled over into the breakdown lane to assist Brian, who was panicking and trying to remove his soiled clothes. RSOF 14; SOF 20.

Soon after, around 8:38 a.m., Defendant-Massachusetts State Police Trooper Stevie Browning ("Browning"), who was driving northbound on Route 1, noticed Daniel's truck in the breakdown lane and observed what looked like a confrontation between Daniel and Brian. RSOF 17. Browning passed Daniel's truck and pulled over into the breakdown lane in front of it. RSOF 32. He got out of his patrol vehicle and walked up to the Corbetts where he learned that Daniel was Brian's father, Brian was disabled, and that Brian had had a bathroom accident and was upset. RSOF 27. Daniel told Browning that he had called Brian's mother, Cheryl, and that she was the best at calming Brian down. RSOF 51. Thus, at the outset, Browning was made aware of the accommodation Brian's father was requesting: to wait for Cheryl Corbett to arrive as she could calm Brian down.

Browning told Brian to get back in the car, which caused Brian to tense up and become more irritated and panicked. RSOF 27. Browning then reached for and unholstered his taser. RSOF 68. Alarmed, Daniel told Browning that a taser could kill Brian, on account of his heart condition. RSOF 68.

Within two minutes of Browning's arrival, the second trooper, Defendant Jeffrey Bermani ("Bermani"), arrived. RSOF 12. He observed Browning standing on the sidewalk with Daniel, who was holding Brian. RSOF 18. Bermani parked his patrol vehicle so as to divert traffic out of the right-hand travel lane. RSOF 32. As Bermani approached, Browning walked away from Daniel and

3

Brian to meet Bermani and fill him in on what was going on. RSOF 18. Soon after, they got Brian to get back inside Daniel's truck. Defendant-Troopers Gary Sacco ("Sacco") and Christopher Goodwin ("Goodwin") arrived minutes later. Sacco also parked his cruiser so as to divert traffic to the left, and called for EMS to respond. RSOF 12; SOF 79.

Not only had Daniel informed the defendants that Brian was disabled, but Defendants Bermani and Goodwin testified that it was immediately "obvious" that Brian had Down Syndrome. RSOF 30. All Defendant-troopers knew that Cheryl was on her way and that she would be able to calm Brian down. RSOF 51. Bermani in particular was personally familiar with the symptoms of Down syndrome. RSOF 33. He testified that he knows that emotional outbursts are common and understood the significance of Daniel's request to wait for Brian's mother because "sometimes one parent is better with the child than the other." RSOF 70.

After Brian got back into the truck, the troopers on scene kept Brian inside by holding the doors shut. SOF 81. But within moments, as Bermani and Goodwin stood at the driver's side door, Browning ordered them to "just take him down into custody." RSOF 43. As Brian leaned out of the window, Goodwin and Bermani grabbed Brian by his arms, pulled him through the window, forced him face down to the ground causing bruising and scrapes on his right shoulder and both knees. RSOF 43. As Brian lay naked and face down on the pavement, Goodwin and Bermani twisted his arms and wrists at ninety-degree angles behind his back in a "compliance technique." RSOF 43. Sacco held Brian's legs. RSOF 43. Goodwin and Bermani then handcuffed Brian's wrists behind his back and left him on the pavement. RSOF 43. Goodwin heard Brian say that he was "scared" after the handcuffs were applied. RSOF 36.

As the officers could have anticipated, the ambulance arrived just as Brian was being handcuffed. RSOF 47. He was then handcuffed to a gurney and put inside the ambulance alone.

4

RSOF 47. Minutes after, Cheryl arrived to find Brian handcuffed inside the ambulance and "whining like a puppy." SOF 53; RSOF 54; RSOF 55.

Browning told Cheryl he was going to "arrest" Brian for assaulting Daniel—by which he presumably meant taking Brian to the station for booking, as Brian was already in handcuffs. RSOF 44. He refused Cheryl's request to take Brian home. RSOF 44. After some debate, Cheryl's options, according to Browning, were Brian's arrest or having Brian transported to the hospital. RSOF 44. It was only with this ultimatum that Brian's parents had him brought to a hospital. RSOF 44.

It is obvious that Brian is an exquisitely vulnerable person. The incident has had severe, long-standing and seemingly irrevocable repercussions.  RSOF 61. According to the director of his program, Brian has "not been the same since [the incident]." RSOF 61. He was diagnosed with Post Traumatic Stress Disorder (PTSD) and anxiety and continues to be treated with therapy and medications. RSOF 61. He now fears leaving his house and being in a car. RSOF 61. Daniel even replaced his truck, hoping that would help. RSOF 61. But it did not help. Brian "just wants to stay home." RSOF 61. Brian's fear of getting in cars and travel in general has had a tremendous impact on his and his family's lives. RSOF 61. After the incident, he didn't want to go to his program, and even today he only attends a couple days a week for limited hours. RSOF 61. Because he is afraid to ride in a car, two family members need to be in the car with him. RSOF 61.

Before the incident, Brian was an avid sports fan eager to attend his nephews' games. RSOF 61. He would attend all of the games, stay for the entire time, and socialize with the other attendees. RSOF 61. Now, Brian does not want to leave the house to attend the games. RSOF 61. He mostly watches them online. RSOF 61. When his family can convince him to leave the house to watch his nephews play, Brian is medicated, will only stay for fifteen to thirty minutes, and watches the clock the entire time. RSOF 61.

The defendants deposed Brian. When asked about what happened after his father pulled over on Route 1, Brian stated "cops." RSOF 61. When asked to explain what happened, Brian testified, "handcuffs". RSOF 61. His family describes him screaming "NO HANDCUFFS" and "no Route 1" when his family tries to get him into a car. RSOF 61. According to Brian's mother, "[t]his whole thing stems back from when they handcuffed him." RSOF 61.

### III.    Legal Standard

Summary judgment is appropriate only when there are no disputes as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The facts must be considered in the light most favorable to the nonmoving party, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), and all justifiable inferences must be drawn in his favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). "The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trial worthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006).

### IV.    Analysis

### A. A Reasonable Jury Could Conclude that the Defendants Failed to Provide Brian with a Reasonable Accommodation in Violation of his Rights Under MERA

The Massachusetts Equal Rights Act (MERA) is a broad state anti-discrimination statute meant to prevent the public and private discrimination of handicapped people. *Haskins v. President and Fellows of Harvard College*, No. 993405, 2001 WL 1470314, at *4 (Mass. Super. Ct., Sept. 18, 2001). MERA's drafters intended it to "incorporate contemporary and progressive thinking about civil rights." Stephen P. Johnson, *The 1989: Massachusetts "Equal Rights Law": A Short History*, Boston Bar J. 17, 18 (March/April 1990) (authored by a drafter of MERA). It reads:

> Any person within the commonwealth, regardless of handicap or age as defined in chapter one hundred and fifty-one B, shall, with reasonable accommodation, have the same rights as other persons to make and enforce contracts, inherit, purchase, lease, sell, hold and convey real and personal property, sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and

6

property, including, but not limited to, the rights secured under <u>Article CXIV of the Amendments to the Constitution</u>.

G.L. c. 93 § 103 (emphasis added). Thus, the statute incorporates Article CXIV of the Massachusett Declaration of Rights, which was enacted in 1981 out of fear that federal law was weakening its protections for the disabled. *See* Crane, Howard, Schmidt & Schwartz, *The Massachusetts Constitutional Amendment Prohibiting Discrimination on the Basis of Handicap: Its Meaning and Implementation*, 16 Suffolk U.L.Rev. 47, 52–56 (1982). *See also, Greaney v. Heritage Hosp., Inc.*, No. CA 952547, 1995 WL 1146185, at *6 (Mass. Super. Ct., Dec. 18, 1995). Article CXIV provides:

> No otherwise qualified handicapped individual shall, by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth.

This broad language was modeled after the Federal Rehabilitation Act and prohibits the same conduct as the ADA. *See Shedlock v. Department of Correction*, 442 Mass. 844, 854 (2004). Violations of Article CXIV, and by extension, MERA claims, are analyzed in the same way as ADA claims. *Id.*; *see also Brodsky v. New England Sch. of L.*, 617 F. Supp. 2d 1, 4 (D. Mass. 2009) ("the term 'handicap' as used in the MERA is 'virtually identical to the definition of 'disability' in the ADA and Rehabilitation Act.'").

### B.  <u>MERA Applies to the Circumstances of this Case</u>

Despite the broad applicability of the protections of MERA, Defendants contend that it should not be applied to the circumstances of this case. Def. Memo., at 18-20. They cite out-of-circuit ADA caselaw to support the proposition that Massachusetts law does not prohibit disability discrimination at the hands of police. Def. Memo., at 19. Their contention fails because Title II of the ADA, and by extension MERA, <u>does</u> apply to law enforcement activities.

In enacting the ADA, Congress intended "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Gray v. Cummings*,

917 F.3d 1, 14 (1st Cir. 2019), citing 42 U.S.C. § 12101(b)(1). Title II of the ADA (similar to Article 114) provides:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. §12132. The U.S. Department of Justice, responsible for promulgating regulations interpreting the ADA, confirms that "title II applies to anything a public entity does." 28 C.F.R. pt 35 App. B. *See also* H.R.Rep. No. 485(II), 101st Cong., 2d Sess., 84 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 367 (stating that Title II is intended to apply to "all actions of state and local governments."). *See also Bahl v. Cnty of Ramsey,* 695 F.3d 778, 787-88 (8th Cir. 2012). By its plain language and regulations, Title II thus applies to law enforcement activities. Notwithstanding some disagreement between the circuit courts concerning the contours of the ADA's applicability to arrest,[4] the First Circuit assumed that it did without deciding the issue in *Gray v. Cummings*, 917 F.3d 1, 17 (1st Cir. 2019) ("it is sufficient for us to assume, favorably to [the non-moving party on

---

[4] The majority of Circuits who have decided whether Title II of the ADA applies to *ad hoc* police encounters have concluded that it does. *Haberle v. Troxell*, 885 F.3d 170, 180 (3d Cir. 2018) ("police officers may violate the ADA when making an arrest by failing to provide reasonable accommodations for a qualified arrestee's disability, thus subjecting him to discrimination. Given that catchall, we believe that the ADA can indeed apply to police conduct during an arrest."); *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1085 (11th Cir. 2007) ("Title II prohibits discrimination by a public entity by reason of [plaintiff]'s disability" during investigations and arrests); *Sheehan v. City & Cnty. Of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), rev'd in part, cert. dismissed in part sub nom. *City & Cnty. Of San Francisco, Calif. v. Sheehan,* 575 U.S. 600 (2015) ("We agree with the majority of circuits to have addressed the question that Title II applies to arrests. The ADA applies broadly to police 'services, programs, or activities.'").The Fifth Circuit has held that the ADA does not apply to street-level law enforcement activities "prior to the officer's securing the scene and ensuring that there is no threat to human life" but may afterwards. *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000). The Court made clear its intent to limit its holding to the circumstances of the facts in front of it: a man with schizophrenia threatened suicide by cop and approached an officer holding a knife. *Id.* at 797, 801. But even under that standard, the ADA would apply to a situation like what happened here. There was no "threat to human life" because Brian was secured in the truck when Defendants violently arrested him. RSOF 41, 44. Almost none of Defendant's citations actually support their proposition that the ADA does not apply to law enforcement activities. *See* Def. Memo., at 19, citing *Bahl v. Cnty. of Ramsey*, 695 F.3d 778, 784 (8th Cir. 2012)(explaining that the court "need not decide whether the act of a law enforcement officer effecting a traffic stop is a covered service[]" and focusing analysis on exigency); *Tucker v. Tennessee*, 539 F.3d 526, 535 (6th Cir. 2008) (noting a lack of guidance as to whether the ADA applied to arrests and dismissing claim on other grounds); *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 899 (8th Cir. 2014) (deciding ADA issue on grounds other than whether the ADA applies to arrests). The only case they cite that actually addresses the ADA's applicability to street-level police activities was *Hainze* (discussed *supra*). 207 F.3d at 801. Defendants, however, did not argue that Brian posed a "threat to human life". *See* Def. Memo., at 19.

summary judgment], that Title II of the ADA applies to ad hoc police encounters"). And district courts in this circuit have followed suit. *See e.g. Chase v. City of Bangor,* 2021 WL 1396277, *6-7 (D.Me. Apr. 13, 2021).

Art. CXIV (incorporated by MERA) uses nearly identical language to Title II to prohibit discrimination within "any program or activity within the commonwealth." And it was intended to sweep even more broadly than Federal disability protections. *See Brooks v. Martha's Vineyard Transit Authority,* 433 F.Supp. 3d 65, 75 (D.Mass 2020). Critically, MERA is not limited in its application to public entities. *See* Crane, et. al., *The Massachusetts Constitutional Amendment Prohibiting Discrimination on the Basis of Handicap: Its Meaning and Implementation*, 16 Suffolk U.L.Rev. 47, 52–56 (1982); *Guckenberger v. Boston University,* 957 F.Supp 306, 324 (D.Mass 1997). Art. CXIV applies to public and private individuals. *See Guckenberger*, 957 F.Supp at 324 ("By its plain language… [Art. CXIV] does not limit the pool of potential defendants to public actors… Rather, the amendment appears to sweep broadly, securing the right of handicapped persons against discrimination perpetrated by any private person or entity." (internal citations and quotation marks omitted)).

While Plaintiff has not located a Massachusetts court decision applying MERA in the arrest context, the state courts would be likely to hold that MERA's broad protections against disability discrimination would extend to the circumstances of the present case even irrespective of the scope of its federal analogue. *See Bos. Gas Co. v. Century Indem. Co.*, 708 F.3d 254, 264 (1st Cir. 2013) ("In examining questions of Massachusetts law, … in the absence of precedent directly on point, [Federal Courts] make an informed prediction as to what the SJC would decide if presented with the question.").

C. **Applying the Theories of Discrimination Courts Have Adopted Under the ADA, a Reasonable Jury Could Conclude that the Defendants are Liable Under MERA**

Courts have adopted two theories—the effects theory and the accommodation theory—when considering a violation of the ADA in the arrest context. The "effects" theory "holds that a violation may be found when 'police wrongly arrest[] someone with a disability because they misperceive[] the effects of that disability as criminal activity.'" *Gray*, 917 F.3d at 15 (*quoting Gohier v. Enright,* 186 F.3d 1216, 1220 (10th Cir. 1999)). The "accommodation" theory "holds that a violation may be found when police officers 'properly investigated and arrested a person with a disability for a crime unrelated to that disability, [but] they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process then other arrestees.'" *Id.* (quoting *Gohier*, 186 F.3d at 1220-1221). A reasonable jury could find liability against the defendants on both of these theories.

### 1. *"Effects" Theory*

When Defendant State Troopers arrived on the scene, Brian was in a panicked state. He was attempting to remove his clothing on the sidewalk adjacent to the roadway, and his father was having difficulty getting him back into the truck. SOF 35. Brian's disability was known to Defendants. RSOF 30; RSOF 34. He is four feet eleven inches tall, appears childlike, and was acting in a manner that made his disability obvious. RSOF 4, 30. Bermani and Goodwin testified that it was immediately "obvious" that Brian had Down Syndrome. In addition, Daniel immediately informed the defendants that Brian was disabled. RSOF 30. A reasonable jury could find that Brian's behavior was a manifestation of his disability and that was understood by the Troopers. In fact, Bermani, who has personal experience with a relative with Down Syndrome, understood that it causes emotional outbursts like the one Brian was experiencing. RSOF 70.

In *Gray*, the Court stated that to prevail on the "effects theory" the Plaintiff would "at least have to show that [the officer] knew that [any alleged criminal conduct] was a symptom of her

10

mental illness rather than [conduct] []warranting criminal charges[].” *Gray*, 917 F.3d at 18. The record in the present case is more than sufficient to meet this threshold.

Instead of recognizing and treating Brian's behavior for what it was—a manifestation of his disability—the defendants treated it as criminal activity and forced him to the ground, as they might anyone engaged in criminal activity, and handcuffed him.

Defendants now argue that they were not “arresting” Brian but simply restraining him pursuant to the community caretaking exception. Def. Memo., at 18-19. This *post hoc* rationalization does not square with their conduct or explanations of their conduct at the time. According to Goodwin, Browning ordered them to “just take him down into custody,” and that is when he and Bermani grabbed Brian by his arms, pulled him through the window, and forced him face down to the ground, causing cuts and scrapes on his knees. RSOF 41, 43, 44. As Brian lay face down on the pavement, Goodwin and Bermani twisted his arms and wrists at ninety-degree angles behind his back in a so-called “compliance technique.” RSOF 43, 44. Sacco then held Brian's legs as he lay on the ground. RSOF 43, 44. Goodwin and Bermani handcuffed Brian's wrists behind his back and left him on the pavement. RSOF 43, 44. This was not conduct consistent with a community caretaking purpose of preventing harm to a vulnerable and clearly disabled individual.[5] A reasonable jury could conclude that the manner in which the troopers arrested Brian and handcuffed him was as it would have been for any individual committing a crime and they therefore discriminated against him for failing to treat his conduct for what it was, and as they knew it to be, namely, a manifestation of his severe disability.

---

[5] The community caretaking doctrine is a narrow exception “totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.’” *Matalon v. Hynnes*, 806 F.3d 627, 634 (1st Cir. 2015), quoting *Cady* 413 U.S. at 441. It does not apply when officers have mixed criminal and community caretaking motives unless their conduct is within the “heartland” of the exception (i.e., moving disabled cars). *Matalon*, 806 F.3d at 635.

There can be no serious question that Browing's intent was to arrest Brian and charge him with "domestic assault." When Cheryl arrived on scene, Browning informed her and Daniel that he was going to arrest Brian for assaulting Daniel. RSOF 44. When Daniel protested that he would not press charges against Brian, Browning explained that he could still arrest Brian because the incident had happened "in the presence of law enforcement[.]" RSOF 44. When Cheryl asked to be able to take Brian home, Browning refused. RSOF 44. Cheryl's options, according to Browning, were Brian's arrest or having Brian transported to the hospital. RSOF 44. This conversation took place as Brian sat handcuffed to the rail of the gurney in the back of the ambulance. RSOF 44. It was only with this ultimatum that Brian's parents agreed to have him brought to a hospital. This conversation relating to Brian's arrest was overheard by Goodwin. RSOF 44.

The decision in *Ravenna v. Village of Skokie,* 388 F.Supp 3d 999 (N.D. Ill June 7, 2019), is instructive. There the plaintiff was known to the police department as delusional. She had made repeated complaints to the police concerning her next-door neighbor that the police discovered were not reality based. *Id.* at 1002. At some point the police received a complaint from the neighbor alleging conduct that officers determined provided probable cause for plaintiff's arrest for disorderly conduct and officers carried out that arrest. The court, relying on the explanation in *Gray* of the "effects" and "accommodation" theories, held that "[a] reasonable jury could find liability… under both theories. There is evidence that [the entity defendant] understood [plaintiff's] actions to be the product of mental illness, not criminal activity. Thus, a jury could find for [plaintiff] on the 'effects' theory." *Id.* at 1009. The holding in *Ravenna* makes clear that an officer may not ignore an individual's disability simply because it manifests as arguably criminal conduct, and further that it is an issue of fact for a jury to determine.

### 2. *"Accommodation" Theory*

Under the "accommodation" theory, a reasonable jury could conclude that the officers failed to reasonably accommodate Brian when they used a compliance hold to handcuff him naked and face down on the pavement rather than to wait a little longer for his mother and an ambulance to arrive. There can be no reasonable dispute that the record reveals that Brian suffered much "greater injury or indignity" in the process of being arrested than a similarly situated individual without Brian's significant disabilities. RSOF 4, 41, 43, 44, 61.

Placing Brian in handcuffs in the manner in which they did caused Brian significant trauma. RSOF 61. Goodwin heard Brian say that he was "scared" after he handcuffed him. RSOF 36. When Cheryl arrived, she found Brian handcuffed to the gurney inside the ambulance, "whining like a puppy." RSOF 55. As described *supra,* the incident has greatly affected Brian's quality of life. He now lives in terror of leaving the house and getting in the car. RSOF 61. He is in therapy and must take medication to manage his anxiety. RSOF 61.

Plaintiff has pointed to a reasonable and obvious accommodation, which was simply to continue to hold onto Brian for the few moments remaining until the ambulance and his mother arrived, rather than to force him face down on the roadway naked, place him in a compliance hold, and apply handcuffs. RSOF 34, 44. Such an accommodation with a mentally disabled individual is a typical accommodation recognized by Courts. *See e.g., Sheehan v. City & Cnty. Of San Francisco*, 743 F.3d 1211, 1233 (9th Cir. 2014), rev'd in part, cert. dismissed in part sub nom. *City & Cnty. Of San Francisco, Calif. v. Sheehan,* 575 U.S. 600 (2015); *see also Larkin v. Kenison,* 475 F.Supp.3d 1124 (2020) rev'd and remanded, No. 20-16573, 2022 WL 1769791 (9th Cir. June 1, 2022) (a reasonable jury could find that the officer, who chased, yelled at, bear-hugged and then executed a leg sweep to bring Plaintiff to the ground, could have employed less confrontational tactics). Moreover, there is ample authority to say that an officer acts unreasonably under the ADA when he or she handcuffs a person with a disability having an emotional outburst. *See A.G. v. Fattaleh*, 614 F.Supp.3d 204, 240-

242 (W.D. N.C. 2022) (denying the town defendant's motion for summary judgment on plaintiff's ADA claim where a school resource officer handcuffed an autistic student and put him face down on the floor during an emotional outburst); *D.L. by and through S.L. v. Hernando County Sheriff's Office*, 620 F.Supp.3d 1182, 1188-1189, 1200-1203 (M.D. Fla. 2022) (denying the defendant's motion to dismiss an ADA claim where the plaintiff alleged that an officer handcuffed a student with non-verbal autism during an emotional outburst); *A.V. through Hanson v. Douglas County School District RE-1*, 586 F.Supp.3d 1053, 1058-1059, 1064-1065 (D. Colo. 2022) (same); *D. P. v. School Board of Palm Beach County*, 658 F.Supp.3d 1187, 1203-1204, 1236-1237 (S.D. Fla. 2023) (Cannon, J.) (denying the defendant's motion to dismiss where the plaintiffs—who were students with mental disabilities—alleged that officers, rather than offering reasonable accommodations, handcuffed them for infractions as minor as throwing stuffed animals).

In a light most favorable to the Plaintiff, a reasonable jury could find that the troopers should have accommodated Brian by employing a less violent approach and avoiding the take-down, the compliance hold, and the handcuffs. "Judgments about reasonableness are usually made by juries in arguable cases, even if there is no dispute about what happened…." *Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691, 694 (1st Cir. 1994); *see also Summers v. City of Fitchburg*, 2016 WL 4926415, at *8 (D. Mass. Sept. 15, 2016) (citing *Valle-Arce v. Puerto Rico Ports Auth.*, 651 F.3d 190, 198 (1st Cir. 2011) (concluding that whether the defendant failed to provide a reasonable accommodation is a question of fact for the jury); *Burnett v. Ocean Props., Ltd.*, 422 F. Supp. 3d 369, 382 (D. Me. 2019), aff'd, 987 F.3d 57 (1st Cir. 2021), citing *Valle-Arce v. Puerto Rico Ports Auth.*, 651 F.3d 190, 201 (1st Cir. 2011) ("Whether an employer failed to grant a reasonable accommodation is a question of fact to be determined by the jury."); *Frye v. Aspin*, 997 F.2d 426, 428 (8th Cir. 1993) ("The question whether an employer has provided a "reasonable accommodation" is ordinarily a question of fact."); *Brennan v. Stewart*, 834 F.2d 1248, 1262 (5th Cir. 1988), quoted in *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19,

14

24 (1st Cir. 1991) ("the 'reasonable accommodation' question [is] decided as an issue of fact—meaning, of course, that it is one for the trial court or jury….).

In *Ravenna*, the court held that

"a reasonable jury could find that [the entity defendant] policy requiring arrest for misdemeanor offenses, as applied to the misdemeanor disorderly conduct complaint against [plaintiff], exhibits deliberate indifference to [plaintiff's] disability. This case likely would have been avoided if [the entity defendant] had issued a summons rather than subjecting her to the alleged violence and indignity of arrest."

388 F.Supp 3d at 1009. Analogously, in the present case, this lawsuit, and the significant damage done to Brian, would have been avoided if Defendants simply waited for the arrival of Brian's mother and the ambulance they knew would arrive within minutes. *See Sheehan*, 743 F.3d at 1233 (holding that a reasonable jury could find that officers were required to employ less confrontational tactics, including the accommodations the plaintiff alleged were necessary). Indeed, as it happened, the ambulance arrived just as officers were handcuffing Brian. RSOF 45-47.

### D. Defendants Used Excessive Force Against Brian in Violation of his Fourth Amendment Rights

A reasonable jury could also conclude that under the circumstances the takedown and handcuffing of Brian by officers constituted a quantum of force that was unreasonable and excessive in violation of the Fourth Amendment.

The Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989) set forth the standard for lower courts to consider in determining reasonableness in the context of an excessive force claim. The Court articulated three factors: "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Gray*, 917 F.3d at 8 (quoting *Graham*, 490 U.S. at 396) (alterations in original)). The Court in *Gray* added that "…the level of force that is constitutionally permissible in dealing with a mentally ill person 'differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who

15

poses a threat to the community." *Id.*, at 12 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010)) (emphasis added).  "Consequently, a subject's mental illness is a factor that a police officer must take into account in determining what degree of force, if any, is appropriate. *Id.* at 12, citing *Estate of Armstrong*, 810 F.3d at 900; *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004).

A reasonable jury could conclude on the record in this case that the force used against Brian was *not* appropriate. The present circumstances are similar to *Gray*, where a plaintiff with bipolar disorder and paranoid schizophrenia escaped from a psychiatric facility. See *id.* at 5. In *Gray* the Court "th[ought] it important" that the officer was not investigating a crime but rather looking for someone in the throes of a psychiatric crisis. *Id.* at 8.

The *Gray* court employed the *Graham* factors in holding that a reasonable jury could conclude the officer had used excessive force. *Id.* at 9. With respect to the first factor, the Court stated that "when the subject of a seizure has not committed any crime, the first *Graham* factor ordinarily cuts in the subject's favor." *Id.* at 8. While the Court acknowledged that Gray had, in fact, committed a crime, it nonetheless reasoned that Gray's "failure to obey [the officer's instructions] was at most a minor crime, [and] not one that would tip the first *Graham* factor in [the officer's] favor." *Id.* Here as well, Brian did not obey the Defendants. He did not sit calmly in the truck so that Daniel could drive them home. SOF 40. But that and his alleged "domestic assault" against his father (for which he was never charged) were both obviously symptoms of his disability, and minor. *See* RSOF 26, 37, 38 43, 44. The first *Graham* factor thus cuts in Brian's favor.

The *Gray* court also concluded the second *Graham* factor was in Gray's favor because at the time of the incident, she "was shuffling down the sidewalk barefoot and unarmed [and] only posed a danger to herself (especially given Cummings's distinct height and weight advantage)." *Gray*, 917 F.3d at 9. Again, similarly here, Brian only posed a danger to himself. And he, at 4'11 and 130lbs was

severely outmatched by the several full-grown State Troopers that surrounded the space to which he had been confined. RSOF 18, 37, 41, 44. The truck was in the breakdown lane and the right-hand travel lane had been blocked off. RSOF 32. Bermani and Goodwin pulled Brian out of the truck by the biceps and had him secure. RSOF 12. But still, they forced him to the ground, bent his arms behind his back, and handcuffed him. RSOF 41, 43, 44. If Brian's emotional outburst posed a threat to anyone, like Gray, it was to himself. Because Brian caused neither Defendants nor anyone else an immediate threat of harm, the second factor also cuts in his favor.

In *Gray*, Gray's resistance to arrest was undisputed and so the final factor went to the defendant officer's side of the ledger. *Gray*, 917 F.3d at 9. The Court nevertheless found that the totality of the factors supported Gray's excessive force claim and denied the officer's motion for summary judgment on the issue. *Id.*; *see also Kingsley v. Hendrickson,* 576 U.S. 389, 397 (2015) (recognizing the flexibility of the *Graham* inquiry). Here, Plaintiff does not dispute Brian's resistance to going home with his father in the truck. RSOF 25, 26, 37, 38. It is, however, disputed that Brian continued to resist after Bermani and Goodwin secured Brian by grabbing his arms and pulling him out of the truck window. RSOF 43, 44, 45. A reasonable jury could find that Brian was compliant when Defendants forced him to the ground face down, twisted his hands behind his back, handcuffed him, and held his legs. RSOF 45.

Because (in the light most favorable to him) all three *Graham* factors weigh in Brian's favor, a reasonable jury could conclude that Defendants used excessive force in violation of Brian's rights.

### E. The Defendant Officers Do Not Have Qualified Immunity

A government official cannot claim the protections of qualified immunity when he or she "violate[s] [a] clearly established statutory or constitutional right[] of which a reasonable person would have known." *Conlogue v. Hamilton*, 906 F.3d 150, 154 (1st Cir. 2018). "The qualified immunity analysis has two facets: '[t]he court must determine whether the defendant violated the plaintiff's

constitutional rights' and then must determine 'whether the allegedly abridged right was 'clearly established' at the time of the defendant's claimed misconduct.' *Gray*, 917 F.3d at 10.

As explained above, Defendants violated Brian's Fourth Amendment right not to be subjected to excessive force. Whether the right was clearly established, includes two points of analysis.

> First, the plaintiff must identify either controlling authority or a consensus of cases of persuasive authority sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm. Second, the plaintiff must demonstrate that an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law.

*Gray*, 917 F.3d at 10 (internal quotations marks and citations omitted).

Despite the fact that Brian was twenty-nine, his unique presentation (Officer Browning believed he was a teenager) and level of functioning should persuade this Court to evaluate the qualified immunity issue with reference to decisional law that considers Brian's unique vulnerabilities. RSOF 4, 30. Those are decisions involving children. There is a consensus of persuasive authority sending a clear signal that treating an individual like Brian as the officers did exceeds the level of force allowed by the Fourth Amendment. The Fourth, Ninth, and Eleventh Circuits have addressed instances where officers handcuffed children. In *E.W. by and through T.W. v. Dolgos*, 884 F.3d 172, 176-177 (4th Cir. 2018), the Court held that handcuffing the plaintiff, an eleven-year-old, violated the Fourth Amendment. *Id.* at 182-185. Significantly, the Fourth Circuit noted the gravity of handcuffing a child "given the risk of lasting trauma among children exposed to the criminal justice system at a young age." *Id.* at 182 n.4.

The Eleventh Circuit considered a similar scenario in *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1300, 1306 (11th Cir. 2006), and rejected the officer's defense of qualified immunity to his handcuffing of the nine-year old. *Id.* at 1306. In *Tekle v. United States*, 511 F.3d 839, 847 (9th Cir. 2007), the Court held that a reasonable jury could conclude that in the context of multiple federal

18

agents handcuffing a barefoot, eleven-year-old at his home, they used excessive force. In *C.B. v. City of Sonora*, 769 F.3d 1005, 1010, 1026 (9th Cir. 2014), the Ninth Circuit affirmed the district court's rejection of the defendants' qualified immunity defense where officers handcuffed a sixth grader. *Id.* at 1026

Decisional law concerning handcuffing of children and those with severe disabilities has sent a clear message to officers that handcuffing of such individuals should be done sparingly. [6] The defendants are not entitled to qualified immunity in this case.

## F. A Reasonable Jury Could Conclude Defendants are Liable for Assault and Battery

Police privilege only protects officers who use reasonable and necessary force when carrying out their official duties. *Commonwealth v. Asher*, 471 Mass. 580, 588 (2015). Force that is excessive under the Fourth Amendment by definition is unreasonable. *See Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009). Because, as explained above, a reasonable jury could conclude that Defendants used excessive force, they are not protected by police privilege and a jury could likewise find that they are liable for the tort of assault and battery.

## G. A Reasonable Jury Could Conclude Defendants are Liable for Intentional Infliction of Emotional Distress ("IIED")

An IIED claim requires:

(1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress.

---

[6] District Courts have followed *E.W.*, 884 F.3d 172, *Gray ex rel. Alexander*, 458 F.3d 1295, and *Tekle*, 511 F.3d 839 concluding that officers who handcuff disabled children, even those who are having emotional outbursts, violate the Fourth Amendment and are not entitled to qualified immunity. *See*, e.g. *A.G.*, 614 F. Supp. 3d at 225 ("Simply put, *E.W.* placed [the defendant], and all school resource officers on notice that young children who commit minor offenses should not be handcuffed if they pose no safety threat or flight risk."); *D.L. by and through S.L.*, 620 F.Supp.3d at 1195-1197.

*Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 596 (2001). Defendants knew that Brian was a severely disabled and vulnerable person. They should have known that forcing him to the ground naked and handcuffing him would exacerbate the emotional distress the troopers were witnessing first hand.

Under Massachusetts law, "[t]here is an issue for the jury if reasonable people could differ on whether the conduct is extreme and outrageous." *Bassett v. Jensen*, 459 F. Supp. 3d 293, 309 (D. Mass. 2020) (internal quotation marks omitted). A defendant's conduct may amount to "extreme and outrageous" if he or she abuses a position of power or exploits the plaintiff's known vulnerabilities. *See Cady v. Marcella*, 49 Mass. App. Ct. 334 (2000); *Boyle v. Wenk*, 378 Mass. 592 (1979); *see also* 14D Mass. Prac., Summary of Basic Law § 16:16 (5th ed.). Despite recognizing Brian's disability and obvious vulnerability, Defendants abused their power as law enforcement officers by unnecessarily forcing him to the ground and handcuffing him. RSOF 4, 30, 44, 45. Thus, a reasonable jury could find that their conduct was outrageous.

As noted *supra*, Defendants' conduct caused Brian's extreme distress and he has not been the same since the incident. RSOF 61. Now, he struggles even to get into a car and enjoy activities like his nephew's sports games that he used to love so much. RSOF 61. His PTSD and anxiety diagnoses following the incident require medication and therapy. RSOF 61. Because a reasonable jury could find each element in Brian's favor, summary judgment is not warranted.

### V. Conclusion

For the reasons stated, this Court should deny defendants' motion with respect to Counts II, IV, V, VI, and VII of Plaintiff's Third Amended Complaint (Doc. No. 81).

### Request for Hearing

Plaintiff requests a hearing on this Motion.

**Respectfully Submitted,**
Jenna Freeman on behalf of
Brian Corbett,


<u>/s/ Jeffrey Wiesner</u>
Jennifer McKinnon, BBO No. 657758
Jeffrey Wiesner, BBO No. 655814
Owen Woo, BBO No. 715886
Wiesner McKinnon LLP
88 Broad St., Suite 503
Boston, MA 02110
Tel.: (617) 303-3940
Fax: (617) 507-7976
jmckinnon@jwjmlaw.com
jwiesner@jwjmlaw.com
owoo@jwjmlaw.com


May 23, 2025