UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 1:22-cv-11474-LTS

JENNA FREEMAN,                          )
as Guardian of BRIAN CORBETT,           )
                            Plaintiff,  )
                                        )
v.                                      )
                                        )
STEVIE BROWNING, in his individual      )
capacity, JEFFREY BERMANI, in his       )
individual capacity,                    )
CHRISTOPHER GOODWIN, in his             )
individual capacity, GARY SACCO, in his )
individual capacity,                    )
                            Defendants.  )

**DEFENDANTS' CONSOLIDATED REPY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Now come the Defendants and offer this consolidated reply brief in further support of

their Motion for Summary Judgment.  The format of this reply memorandum follows the

Plaintiff's opposition memorandum.

## I.    LAW AND ARGUMENTS

### A.    Through Her Opposition, Plaintiff Concedes She Has Failed to Make Out a MERA Claim

Defendants conduct in securing Brian was undertaken as an effort to prevent any harm

that Brian might have caused to himself or to others.  It was conduct that falls well within the

parameters of the community caretaking doctrine.  Try as she might, the Plaintiff cannot convert

the Defendants' cautious and reasoned response to Brian's conduct into something that it was

not.  It is uncontested that the Defendants knew of Brian's disability and took that into account in

each and every action that they took **(MF ¶¶ 14, 15, 17–20, 22, 25, 27, 29, 35–37, 39, 41–43)**.

1

That the Defendants knew of Brian's disability is, however, not enough for liability to be

imposed upon these Defendants.

> "Finally, to the extent that a 'robust consensus of cases of persuasive authority'
> could itself clearly establish the federal right respondent alleges, *al–Kidd,* 563
> U.S., at ——, 131 S.Ct., at 2084, no such consensus exists here. If anything, the
> opposite may be true. See, *e.g., Bates v. Chesterfield County,* 216 F.3d 367, 372
> (C.A.4 2000) ("Knowledge of a person's disability simply cannot foreclose
> officers from protecting themselves, the disabled person, and the general public");
> *Sanders v. Minneapolis,* 474 F.3d 523, 527 (C.A.8 2007) (following *Bates, supra*
> ); *Menuel v. Atlanta,* 25 F.3d 990 (C.A.11 1994) (upholding use of deadly force to
> try to apprehend a mentally ill man who had a knife and was hiding behind a
> door)."

*City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 617, 135 S. Ct. 1765, 1778, 191

L. Ed. 2d 856 (2015).  When the Defendants restrained Brian, their main concern was to prevent

Brian from running back into Route 1 traffic where he most certainly would have been harmed or

caused harm to others **(MF ¶¶ 41–44)**.

Regardless of the advantage of hindsight the Plaintiff has been provided, she has still

failed to turn this community caretaking interaction into a violation of any rights Brian may have

had under MERA.  The Plaintiff does not cite to any authority that instructs law enforcement

officers to engage in an interactive process with an out-of-control person prior to taking action to

prevent them from harming themselves or others **(MF ¶¶ 35–36, 43)**.  This much the Plaintiff

concedes through her acknowledgment that no case interpreting MERA has declared that it

applies in the context of an arrest (Doc. No. 104 at 10).  Such a concession supports the qualified

immunity arguments of the Defendants on the MERA claim as the critical question for qualified

immunity is whether existing case law gave the Defendants fair warning that their conduct

violated Brian's rights.  See *Jennings v. Jones*, 499 F.3d 2, 16 (1st Cir. 2007) and see Section E

below.

Plaintiff argues that it was an effect of Brian's disability that caused him to act as he did. Again, there is no case that Plaintiff can point to that requires law enforcement officers to allow an out-of-control person to continue on with his behavior just because it might be caused by a disability **(MF ¶¶25, 27, 38, 40, 43, 45)**. Down syndrome does not confer an immunity against law enforcement action being taken to safeguard such a person, themselves, and the general public. Sheehan, 575 U.S. at 617. That the Defendants' conduct falls within the community caretaking exception and that they are entitled to qualified immunity is beyond dispute. *Id.*

The term "reasonable accommodation" as set forth in the MERA suggests an interactive process that is not compatible with the situation that Brian created on the side of Route 1. In cases addressing law enforcement's response to citizens with a disability, the focus is on securing the scene and making sure everyone is safe. *Id.* That is exactly what the Defendants did here when they took hold of Brian, guided him from the vehicle, and escorted him to the ground **(MF ¶¶ 27–30, 40–48, 64; Defendants' Exhibit 8 ¶¶ 19–22)**.

Plaintiff's reliance on *Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1233 (9th Cir. 2015) is misplaced as that case was overturned by the United States Supreme Court. The Supreme Court granted the law enforcement defendants in that case qualified immunity on the exact point the Plaintiff cites as support for her argument.

> "'In sum, we hold that qualified immunity applies because these officers had no "fair and clear warning of what the Constitution requires.' *al–Kidd, supra,* at —— , 131 S.Ct., at 2086–2087 (KENNEDY, J., concurring). Because the qualified immunity analysis is straightforward, we need not decide whether the Constitution was violated by the officers' failure to accommodate Sheehan's illness."

*Sheehan*, 575 U.S. at 617.

Most of the cases cited by Plaintiff occurred in the employment context where an interactive process between an employee and an employer can occur in the calm of a human

resources office of the workplace.  The side of a highspeed highway is not a similar setting.

Rather, it is a setting that would make such a process not only impracticable, but dangerous.

Plaintiff's argument also suggests that Brian was entitled to an accommodation because of his Down syndrome.  According to Plaintiff, the Defendants should have waited longer for his mother to appear on scene or should have utilized a different tactic than the one they chose. There is no case cited by Plaintiff that puts the Defendants on notice that they are required to stand idly by while an out-of-control person creates a hazard on the side of a highspeed highway. The Defendants were not required to wait for Brian's mother, the ambulance, or for Brian to calm down prior to acting as they did.  In fact, the state of the law is to the contrary.  *Id. and Lockhart-Bembry v. Sauro*, 498 F.3d 68, 76 (1st Cir. 2007).

Finally, a large portion of Plaintiff's argument on this issue was addressed through a footnote.  "[A]rguments raised only in a footnote or in a perfunctory manner are waived." *Duggan v. Martorello*, 596 F. Supp. 3d 195, 204 (D. Mass. 2022) quoting *National Foreign Trade Council v. Natsios*, 181 F.3d 38, 60 n.17 (1st Cir. 1999).

### D.  Defendants Force Against Brian was Reasonable and not in Violation of his Fourth Amendment Rights

The Plaintiff fails to note or respond to the fact that the use of force employed by the Defendants was undertaken in their capacity as community caretakers. As described in further detail in the Defendants' Consolidated Memorandum of Law in Support of Their Joint Motion for Summary Judgment, the use of force employed was in the context of community caretaking purposes and was reasonable under the community caretaking standard.

Under this standard, the use of force was reasonable and not excessive as the Troopers have a privilege to act as they did. Here, the Defendants attempted to restrain Brian in different ways. First, after watching Brian assault his dad and run onto the highway, creating a danger to

himself and others, they put Brian into his father's vehicle to de-escalate his behavior **(MF ¶¶25, 27, 30, 35)**. This attempt clearly did not work as Brian assaulted his father in the vehicle forcing Daniel Corbett to flee **(MF ¶38)**. Then, while alone in the vehicle, Brian continued to throw items at the Defendants. Finally, Brian attempted to crawl out of the window to escape the car **(MF ¶¶40)**. At that point, the Defendants had to restrain Brian in order to keep him and others safe.  The Defendants utilized the least amount of force to restrain Brian when they elected to handcuff him.  The Defendants' conduct was reasonable under the community caretaker doctrine as it was undertaken to protect Brian from himself and to protect others.  "[T]there is no requirement that officers must select the least intrusive means of fulfilling community caretaking responsibilities" *Lockhart-Bembry*, 498 F.3d at 76.  Despite Plaintiff's protestations to the contrary, the Defendants were entitled to utilize their reasonable judgment in deciding how to put an end to the public safety threat created by Brian's conduct.  Under the community caretaker standard, the Defendants' use of force was both reasonable and justified.

Instead of addressing the use of force under the scope of a community caretaker standard, the Plaintiff primarily relies upon *Gray v. Cummings*, 917 F.3d 1 (1st Cir. 2019) where the Court analyzed exercise force by what is known as the *Graham* factors from *Graham v. Connor*, 490 U.S. 386, (1989). The Plaintiff argues that the facts in this case and *Gray* are analogous and thus this Court should come to the same conclusion as the Court in *Gray* did when applying each of the *Graham* factors. Even if this present case should be analyzed by the *Graham* factors, the Defendants' use of force was reasonable when applying the *Graham* factors.

As reflected in the facts of this case, the application of the *Graham* factors in *Gray* is inapplicable to the present case. In both *Gray* and the present case, the Plaintiff did have a mental disability, and the officers were not effectuating an arrest. However, that is where the

similarities between the cases end. First, it is important to note the difference of the scene when the officer arrived in the *Gray* case, as opposed to when Tpr. Browning arrived on the scene. In *Gray*, the officer in responding to a call for service found Gray walking along a sidewalk after she had left the hospital and a call was made to the police to return her to the hospital. *Id.* at 6. At the time, Gray seemingly was not causing any harm to anyone. *Id*. Here, Tpr. Browning observed what appeared to be a commotion on the side of the highway, with Brian throwing punches at his father **(MF ¶25).** The commotion prompted Tpr. Browning to pull over his cruiser to address what he had observed **(MF ¶26)**. Thus, while the Plaintiff points out that the court in *Gray* found it important that the officer was not investigating a crime but rather looking for someone during a psychiatric crisis, that analysis does not apply here because Tpr. Browning happened upon the scene and witnessed firsthand the behavior that he needed to put a stop to.

The Plaintiff argues that the first *Graham* factor cuts in Brian's favor. In support of this argument, the Plaintiff once again points to *Gray*, arguing that just like in the present case, the disobeying of the officer's orders was at most "a minor crime [and] not one that would tip the factor in [the officer's] favor." *Id.* at 8. Further, in *Gray*, the Court found that the alleged assault did not "tilt the scales" because the officer grabbed her shirt first. *Id.* at 9. Again, unlike in *Gray,* the officers witnessed Brian do more than merely walk on by them.  Rather, they witnessed Brian create a public safety issue by running into Route 1 traffic **(MF ¶38)**. They also had first hand observations of Brian acting out of control, disrobing, and throwing things out of the truck. Brian, unlike Gray, was highly emotional and out of control **(MF ¶40)**. Unlike in *Gray,* this conduct was unprovoked by the troopers.  It was reasonable for the Defendants to believe that once he was out of the vehicle, he would continue on with his dangerous behavior if left unrestrained **(MF ¶¶25, 38, 40, 43)**. While it is true that his conduct may have been the result of

6

his disability and his highly emotional state, it does not negate that the Defendants were witnesses to an out of control man who needed to be restrained to prevent him from hurting himself or others. Because of that, the first factor of *Graham* cuts in the Defendants' favor.

Next, the Plaintiff argues that second *Graham* factor cuts in Brian's favor because Brian only posed a danger to himself, pointing to the difference in size between Brian and the officers. It is important to note, however, that the Court in *Gray*, analyzed the threat to danger in relation to the officers' use of force, which was to tase Gray. *Id.* Tasing an individual is clearly a greater degree of force than handcuffing an individual. Further, as stated above, unlike in *Gray* where the officer had not observed Gray pose a danger to anyone, the Defendants continually saw Brian pose a danger to not only himself, but to others **(MF ¶¶25, 27, 38, 40, 43, 45)**. Tpr. Browning witnessed him running onto the highway, posing a danger to himself and to any oncoming traffic **(MF ¶27, 29)**. It was reasonable for the Defendants to conclude that if Brian had remained unrestrained after exiting the vehicle, he would repeat his behavior, putting himself, his father, the officers, and all those travelling on Route 1 in danger.

The belief by the Defendants that he could pose a danger to others if Brian had remained unrestrained after exiting the vehicle is supported by the fact that Brian attempted to run onto the street after he was out of the vehicle **(MF ¶¶41, 44)**. If any of the Defendants had to pursue the Plaintiff onto the highway, the risk of danger would dramatically increase. Because Brian had posed a threat to multiple parties from the time Tpr. Browning first observed him up to when he observed Brian crawling out the driver's side window, it was reasonable for the Defendants to believe that Brian could continue to pose a threat if he had been left unrestrained after climbing through the window **(MF ¶¶25, 27, 38, 40-41, 43, 45)**. Consequently, unlike *Gray*, where the Court found that there was only a danger to Gray, the second *Graham* factor cuts in the

7

Defendants' favor as clearly Brian had created a situation where both he and others were in danger.

Finally, the Plaintiff attempts to distinguish *Gray* for the third *Graham* factor by arguing that Brian was compliant when Tpr. Bermani and Goodwin secured Brian. As represented through the facts, it is apparent this is not the case. Brian had been non-compliant with each of the Troopers and his father's attempts to de-escalate him **(MF ¶¶29, 34, 38, 44-45)**. The Defendants had observed Brian's resistance to his father's attempt to restrain him on the side of the road **(MF ¶¶24, 34-35)**. The Defendants then witnessed Brian biting, striking, and pinching his father while in the vehicle, forcing his father to leave the vehicle **(MF ¶38)**. Next, Brian attempted to leave the vehicle by crawling through the driver side's window **(MF ¶41)**. Finally, when Tpr. Bermani and Tpr. Goodwin placed Brian in a standing position after he exited the vehicle through the window, he resisted the Troopers by attempting to walk back onto the highway, forcing the Troopers to escort him to the ground **(MF ¶¶44-45)**. Once on the ground, Brian continued to resist the Troopers and only stopped resisting once he was put into handcuffs **(MF ¶¶45-46)**. Tpr. Sacco observed Brian violently bang his legs against the blacktop once on the ground **(MF ¶85)**. Based upon the continuous acts of resistance up to the time Brian was placed in handcuffs, it was reasonable for these Defendants to act as they did to quell the disturbance created by Brian. As such, the third *Graham* factor cuts in the Defendants' favor.

The Plaintiff also fails to note that even though the Court in *Gray* found that the officer's use of force could be found by a jury to be excessive and in violation of Gray's Fourth Amendment rights, the Court found that the officer was shielded by qualified immunity, which is addressed further in Section E.

Thus, under either the community caretaker standard or when applying the *Graham* factors to the facts of this case, the use of force was reasonable under the totality of the circumstances. Consequently, summary judgment should be granted to the Defendants on Count II.

### E.  The Defendants are Entitled to Qualified Immunity

The Plaintiff argues that the Defendants do not have qualified immunity because they handcuffed a combative, self-destructive, adult male whom they recognized as a person with Down syndrome.  The Plaintiff cites various cases in which Courts have found handcuffing a minor child may constitute excessive force not protected by the qualified immunity doctrine.  In the cases cited by the Plaintiff, the children did not pose a safety threat or flight risk.

The Plaintiff does not cite a single case in which the defense of qualified immunity was abrogated because the police officers handcuffed an adult male with Down syndrome who was combative and presented a risk to himself as well as others.  In fact, the reported cases make clear the opposite is true.  Sheehan, 575 U.S. at 617 citing to *Bates,* 216 F.3d at 372. Brian Corbett was not a child.  He stood 4'11" and weighed 130 pounds and his mother characterized him as strong.  (Pl. Ex. A, P144: 11-15.)  He was 29 years old at the time of the incident.  (Pl Ex. M.)  He was a strong, albeit mentally disabled man, who was upset, had exhibited assaultive, self-destructive behavior, had previously run onto a high speed, divided highway and appeared to be trying to run onto that highway again.

The doctrine of Qualified Immunity protects law enforcement officers from liability as long as their conduct "does not violate clearly established statutory authority or constitutional rights of which a reasonable person would have known."  See *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pierson v. Ray*, 386 U.S. 547 (1967). Further, qualified immunity allows individuals acting

in their official capacity the breathing room to make reasonable but mistaken judgments. See *Ashcroft v. AI-Kidd*, 131 S. Ct. 2074, 2085 (2011). It protects all but the obviously incompetent. *Id.* Plaintiffs have the burden of showing "that the Defendants' conduct was the cause in fact of the alleged deprivation." See *Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir. 1997).

In order to assess qualified immunity claims, the Courts have established a two-part test. The "[C]ourt must decide: (l) whether the facts alleged or shown by the Plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the Defendant's alleged violation." See *Estrada v. Rhode Island*, 594 F.3d 56, 62-63 (1st Cir. 2010). The second step has two aspects of its own: "'(1) the clarity of the law at the time of the alleged violation' and (2) whether on the facts of the case, 'a reasonable defendant would have understood that his conduct violated the Plaintiff's constitutional rights.'" *Id.* Both prongs of this test must be satisfied for a Plaintiff to overcome a qualified immunity defense. See *Maldonado v. Fontanes*, 568 F.3d 263, 269-70 (lst Cir. 2009). The critical question is "if a reasonable official would not have understood that his conduct violated Plaintiff's constitutional rights, we must grant him qualified immunity". See *Estrada*, 594 F.3d at 63. Ultimately, the qualified immunity defense should prevail unless the unconstitutionality of the conduct was obviously apparent at the time. See *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004).

Moreover, assessment of the two prongs of the second step of the qualified immunity analysis shows the right a Plaintiff claims was breached must be definitively established. Specifically, an officer must be on notice that his conduct is unlawful, as qualified immunity protects officers from the hazy line between what is acceptable and what is not. See *Saucier v. Katz*, 533 U.S. 194,206 (2001). A Defendant is entitled to qualified immunity where he correctly perceives the situation but has a mistaken understanding as to the legality of his actions. See

10

*Morelli v. Webster*, 552 F.3d 12, 24 (1st Cir. 2009).  As such, the critical question is whether existing case law gives the officer fair warning that his conduct violates a Plaintiff's rights.  See *Jennings. v. Jones*, 499 F.3d 2, 16 (1st Cir. 2007).  See also, *Suboh v. District Attorney's Office of Suffolk*, 298 F.3d 81, 93 (1st Cir. 2002).  Given this standard, Courts have held that qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." See *Hunter v. Bryant,* 502 U.S. 224 (1991).  See also, *Malloy v. Briggs*, 475 U.S. 335, 341 (1986).

In *Anthony v. City of New York,* 339 F.3d 129 (2d Cir. 2003), the Second Circuit Court of Appeals upheld a summary judgment in favor of two New York City Police Officers who took into custody a Down syndrome woman and transported her to a psychiatric ward for observation. The Court found that the officers were entitled to qualified immunity for the warrantless seizure of the Plaintiff and dismissal of the Plaintiff's ADA claim was upheld because there was no evidence that the officers acted with discriminatory intent.

In the case at bar, Brian Corbett was temporarily restrained and then transported to the hospital for his own safety, similar to the Plaintiff in *Anthony*.

The Plaintiff argues the Defendants should have provided some unknown "reasonable accommodation" to Brian Corbett in light of his disability but fails to set forth what accommodation could have been provided to him while he was trying to exit his father's truck through the window and having exhibited combative and self-destructive behavior.

In *Ogunbekun v. Town of Brighton*, 15-CV-6332-CJS-MJP (W.D. N.Y. May 15, 2025), U.S. District Court Judge Charles Siragusa, citing *Anthony*, granted a motion for summary judgment on behalf of the Defendant police officers who took into custody an intellectually disabled adult female who was found in the middle of the street ranting and hallucinating.  Judge

11

Siragusa stated: "[t]o handcuff and detain a person for mental health reasons, an officer must have 'probable cause to believe the person presented a risk of harm to himself or others,'" citing *Kerman v. City of New York*, 261 F. 3d 229, 237 (2d Cir. 2001). *Id.* at *23.

Judge Siragusa discounted Plaintiff's argument that the officers should have waited for the mentally ill Plaintiff to calm down as argued by the Plaintiff in this case. Judge Siragusa ruled the officers had probable cause to arrest and were entitled to qualified immunity. Importantly, Plaintiff acknowledges that there is not a single case that has been decided that states MERA applies in the context of an arrest.

The Defendants had probable cause to arrest and certainly restrain Brian Corbett based upon the assault to his father, his combative and self-destructive behavior, and his attempt to exit his father's truck and enter a major highway, which he had previously done.

**F. Plaintiff Presents no Facts to Support a Common Law Assault and Battery Claim**

The Plaintiff, in Section F of her Rule 56 Opposition, generically asserts assault and battery by the named defendant Troopers on Brian without providing any factual predicate to support that notion. At best, Plaintiff relies on her statements in support of a 4th Amendment excessive force claim, summarily stating that a jury should decide.[1]

The plaintiff significantly misses the fruitful opposition mark and fails to point to record supported facts that equal an assault and battery, merely replying on conjecture and opinion. Rather than point to genuine facts to support this claim, the Plaintiff's opposition mischaracterizes the material facts while conveniently omitting certain undisputed facts

---

[1] The Defendants respectfully refer this Honorable court to their arguments seeking judgment on the 4th Amendment front in their initial memorandum of law and also in the instant reply memo.

revealing probable cause and reasonable use of force.  Specifically, the undisputed facts with relation to this common law claim are that: 1) Trp. Browning while driving in his MSP cruiser observed two men fighting and Brian striking his father Daniel on the side of busy morning Route 1 in Danvers, Massachusetts traffic and stopped his cruiser to inquire. **(MF ¶ 25-26,38);** 2) Brian thereafter ran into Route 1. (**MF ¶27-29).** Trp. Browning ran into the highway to prevent Brian from getting hit by the moving cars and forced Brian to leave the roadway.  **(MF ¶27-29); and** 3). MSP Troopers held both sides of Daniel's truck's doors closed to keep Brian contained until an ambulance arrived until Brian, on his own accord, head-first crawled out the open driver's door window and Troopers Bermani and Goodwin caught him from falling and injuring himself and escorted him to the ground and handcuffed him until an earlier requested ambulance arrived.  **(MF ¶¶25, 27, 32, 38, 43-47, 80-81, 84)**. Plaintiff both mischaracterizes and omits the essential facts at play in this case that Brian ran into Route 1 traffic and climbed out his father's truck's window thereby causing a public safety danger and harm to himself, thus warranting police intervention. **(MF ¶¶25-29, 38, 40-45, 84)**. It is with this background that the Troopers acted to restrain Brian while awaiting an ambulance transport. There are no facts of record reflecting that Brian was assaulted and battered, struck, injured or otherwise by any of the Troopers. The Troopers acted in Brian's best interest and public safety at large. One question relevant to this inquiry remains if the Troopers did not act to restrain Brian: would he have been killed by a Route 1 moving vehicle or would he have broken his neck climbing out his father's truck's window? At bottom, the Troopers did their sworn caretaking duties and risked their personal well-being to assist Brian and his distraught father Daniel. As such, the Troopers' conduct was reasonable and appropriate for the circumstance and privileged, not remotely amounting to an assault and battery. Judgment should enter for all defendants in this matter.

**G.  <u>Plaintiff Presents no Factual Record to Support an Intentional Infliction of Emotional Distress Claim.</u>**

While the Plaintiff asserts an intentional infliction of emotional distress claim, she fails to acknowledge the undisputed facts of what the Defendant Troopers actually did on January 12, 2021. Rather, Plaintiff's opposition to the Rule 56 motion provides at best colorful lawyer created conjecture postured as "facts."  In short, to succeed on a such a claim, the burden of proof remains with the Plaintiff to produce evidence at the summary judgement stage of their case; the crux of such a claim is to show that the each of the defendant Troopers individually acted in such manner that they intended that their conduct  cause emotional distress by way of "extreme and outrageous conduct."  *Howcroft v City of Peabody*, 51 Mass. App. Ct. 573 (2001). The reality of the underlying factual predicate is that all of the Troopers acted with consideration to the fact of Brian's personal safety given his mental limitations and that Brian's father could neither control nor calm Brian. When Brian ran into the Route 1 traffic, it was Trooper Browning who went into the road to protect Brian, not his father. Once Trooper Browning was alerted that Brian had a heart condition, he chose not to use his MSP taser on Brian so as to prevent him running in busy Route 1 again and for his father's safety from Brian striking him. The Troopers called for an ambulance early on into the call to get assistance for Brian and for his safety attempted to keep him in his father's pick-up truck until an ambulance arrived. When Brian crawled out the truck's window, Troopers Bermani and Goodwin were there to catch him and restrain him. When he was banging his legs on the blacktop, Trooper Sacco held his legs to stop him from self-injury. The ambulance arrived and the Troopers had them check-out Brian.  These are the undisputed facts. The Troopers collective actions reflect that they intended to assist Brian. It cannot be reasonably construed that the Troopers' conduct was 'extreme and outrageous' in

14

any viewing of the proper summary judgment supported record.   Judgment should enter in favor

of the Defendant Troopers.

## CONCLUSION AND RELIEF REQUESTED

WHEREFORE, the Defendants, based on the foregoing, respectfully requests that this

honorable court dismiss the Plaintiff's Complaint, with prejudice, and enter judgment in their

favor along with costs and attorneys' fees.

Respectfully submitted,

TROOPER JEFFREY BERMANI,
By his attorneys,

ROGAL & DONNELLAN, P.C.

/s/ Joseph G. Donnellan
Joseph G. Donnellan, BBO# 558060
100 River Ridge Drive, Suite 203
Norwood, Massachusetts 02062
(781) 255-1200
jdonnellan@rogalanddonnellan.com

TROOPER STEVIE BROWNING,
By his attorneys,

LAW OFFICE OF DANIEL J. MOYNIHAN, P.C.

/s/ Daniel J. Moynihan
Daniel J. Moynihan, BBO# 546346
Mark A. Russell, BBO# 568943
271 Main Street, Suite 302
Stoneham, Massachusetts 02180
(781) 438-8800
moynihanlaw@verizon.net
attyrussell.moynihanlaw@gmail.com

**CHRISTOPHER GOODWIN**
By his Attorney,

/s/Timothy J. Duggan
Timothy J. Duggan (BBO #545966)
Duggan & Gianacoplos, LLC
89 Access Road, Unit A
Norwood, MA 02062
T: (781) 762-0077
E: tjd@dcclawyers.com

DEFENDANT GARY SACCO,
By his attorney,

/s/ Michael J. Akerson
Michael J. Akerson, Esq., BBO# 558565
Reardon, Joyce & Akerson, P.C
4 Lancaster Terrace
Worcester, MA 01609
508.754.7285
akerson@rja-law.com

## CERTIFICATE OF SERVICE

I, Joseph G. Donnellan, hereby certify that I served a copy of the foregoing
DEFENDANT'S REPLY MEMORANDUM to all counsel of record, via ECF, this 27th day of
June, 2025.

/s/ Joseph G. Donnellan
Joseph G. Donnellan

15