UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JENNA FREEMAN, as Guardian of BRIAN CORBETT, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 22-11474-LTS |
| STEVIE BROWNING et al., | ) ) | |
| Defendants. | ) ) | |

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 94)

February 17, 2026

SOROKIN, J.

Brian Corbett is a young man with Down syndrome. When he and his father pulled onto

the side of Route 1 because Brian had an accident and was distressed, state troopers intervened.

The situation escalated, and the troopers eventually took Brian to the ground, put him in a

compliance hold, and handcuffed him. The incident has affected Brian's quality of life. Brian's

guardian sued the troopers on his behalf, arguing they used excessive force in violation of the

Fourth Amendment, committed intentional torts, and violated his rights under the Massachusetts

Equal Rights Act.

Pending before the Court is the troopers' joint motion for summary judgment. Doc. No.

94. That motion is fully briefed, and the Court heard oral argument on February 9, 2026. For

the reasons that follow, the motion for summary judgment is ALLOWED IN PART and

DENIED IN PART.

I.    BACKGROUND

   A.    Facts[1]

At the time of the events that gave rise to this case, Brian Corbett was twenty-nine years old.[2]  Id.; Doc. No. 94-12 at 2.  Brian stands four feet, eleven inches tall and weighs approximately 130 pounds.  Doc. No. 105 ¶ 4; Doc. No. 105-1 at 22 (144:8–13).  Brian, who has Down syndrome, has limited communication skills, has the "mental capabilities of a five-year-old," and requires assistance with everyday functioning.  Doc. No. 105 ¶ 4; Doc. No. 94-1 at 11 (31:11–13).  Brian's sister, Jenna Freeman, serves as his legal guardian.  Doc. No. 105 ¶ 2.  Brian's father, Daniel Corbett, was Brian's co-guardian until Daniel's death in 2024.  Id. ¶ 6.

On January 12, 2021, at approximately 8:30 a.m., Daniel and Brian were driving on Route 1 North in Danvers, Massachusetts.  Id. ¶ 13.  This segment of Route 1 North contains, from left to right, two travel lanes, a breakdown lane, a sidewalk, and a guardrail.  Id. ¶ 12; Doc. No. 105-5; Doc. No. 105-6 at 5–6 (26:19–30:3).  The speed limit is fifty miles per hour.  Doc. No. 105 ¶ 12; Doc. No. 105-4 at 5 (27:5–6).

While Daniel and Brian were driving, Brian had a bathroom accident, defecating on himself.  Doc. No. 105 ¶ 13.  Daniel pulled into the breakdown lane.[3]  Id. ¶ 14.  Brian and Daniel

---

[1] The Court views the factual record in the light most favorable to the nonmoving party—in this case, Plaintiff—and draws all reasonable inferences in the nonmoving party's favor.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).

[2] Because this case involves multiple people with the last name "Corbett," the Court refers to the Corbetts by their first names.

[3] According to Trooper Stevie Browning, Daniel later told Browning that Brian had tried to open the door while the vehicle was moving, and Daniel pulled over to keep Brian from exiting a moving vehicle.  Doc. No. 94-3 at 26 (34:15–20).  Once they stopped, Brian got out of the truck, and Daniel followed him out.  Id. (34:22–24).  Plaintiff objects to this and other related evidence on grounds that Browning's testimony about events that took place before he arrived on scene, which he learned about only through conversation with Daniel, is inadmissible hearsay.  Doc. No. 105 ¶ 14.  Defendants argue that all Daniel's statements to troopers are admissible as statements of a party opponent.  Doc. No. 113 ¶ 14 (citing Fed. R. Evid. 801(b)(2)).  Even if Daniel's statements were not admissible for the truth of the matter asserted, they may be

exited the vehicle and went to its passenger side (i.e., away from traffic).  Id. ¶¶ 17, 24; Doc. No. 94-3 at 25–26 (33:15–34:4).

Massachusetts State Trooper Stevie Browning was driving northbound on Route 1 when he saw what appeared to him to be a physical altercation between Brian and Daniel on the side of the road.  Doc. No. 105 ¶¶ 7, 24.  It looked to Browning like Brian and Daniel were "wrestling," with Brian "trying to throw his arms" and Daniel "trying to hold" Brian.  Doc. No. 105 ¶ 25; Doc. No. 94-3 at 23–24 (31:8–12, 32:4–7).  Seeking to intervene, Browning pulled over into the breakdown lane, parked his duty vehicle in front of Daniel's truck, and walked toward the Corbetts.  Doc. No. 105 ¶¶ 24, 26; Doc. No. 94-3 at 25–26 (33:7–34:8); Doc. No. 105-4 at 5–6 (28:2–29:12, 34:7).  On first impression, Browning thought Brian was a teenager.  Doc. No. 105 ¶ 30; Doc. No. 94-3 at 24–25 (32:8–33:1).  Browning is five feet, eleven inches tall and weighs 260 pounds—that is, he stands a foot taller than, and weighs twice as much as, Brian.[4]  Doc. No. 105 ¶ 18; Doc. No. 94-3 at 30–31 (38:20–39:1).

As Browning approached, Daniel walked toward Browning while Brian remained near the side of Daniel's vehicle.  Doc. No. 105 ¶¶ 26, 30; Doc. No. 94-3 at 26 (34:5–13).  Daniel explained that Brian was his son and had Down syndrome.  Doc. No. 105 ¶¶ 26, 30; Doc. No. 94-3 at 26 (34:12, 24).  Daniel told Browning that he and Brian were not fighting; Daniel was trying to get Brian back in the truck.  Doc. No. 105 ¶ 26; Doc. No. 94-3 at 26 (34:10–24).

Browning and Daniel then walked back toward Brian.  Doc. No. 94-3 at 28 (35:6).  Browning tried to talk to Brian about getting back in Daniel's truck, but Brian, in Browning's

---

admissible if offered for their effect on the listener (i.e., Browning).  In any event, the Court need not resolve this dispute now, because admission of Browning's testimony about events prior to his arrival on scene would not affect the Court's resolution of the pending motion.

[4] The other troopers' measurements are not in the record.

words, started "tensing up and getting, you know, displaying some agitat[ion]."  Doc. No. 105 ¶ 26; Doc. No. 94-3 at 28 (36:4–8).  Daniel remarked that Brian was "really agitated" that morning and explained that his wife and Brian's mother, Cheryl Corbett, "usually can calm [Brian] down when he gets like this."  Doc. No. 105 ¶¶ 15, 51; Doc. No. 94-3 at 28 (36:14–18).  Daniel also told Browning that he had left a message for Cheryl and hoped she would show up because she usually was better at calming Brian.[5]  Doc. No. 105 ¶ 51; Doc. No. 94-3 at 29–30 (37:18–38:3).  According to Browning, at some point during the conversation, Brian began running into the travel lanes.  Doc. No. 105 ¶ 27; Doc. No. 94-3 at 28–29 (36:21–37:1).  Daniel grabbed Brian, and Brian then returned to the passenger side of the truck.  Doc. No. 105 ¶ 28; Doc. No. 94-3 at 29 (37:1–7).

While Brian remained on the truck's passenger side, Browning and Daniel had a conversation on the driver's side about the need to keep Brian out of the roadway.  Doc. No. 94-3 at 29, 42–44 (37:8–10, 69:20–23, 70:6–71:21).  Browning unholstered his Taser but did not activate it.  Doc. No. 105 ¶ 68; Doc. No. 94-3 at 42 (69:10–23); Doc. No. 105-4 at 15 (109:5–13).  Daniel implored Browning not to use the Taser on Brian because Brian had a heart defect and could be killed by the Taser.  Doc. No. 105 ¶ 68; Doc. No. 94-3 at 42–43 (69:23–70:2).  Browning reholstered the Taser.  Doc. No. 105 ¶ 68; Doc. No. 94-3 at 43 (70:2–3).  Although Browning never activated his Taser, another trooper testified that Browning subsequently told

---

[5] Cheryl testified that Daniel called her several times, but the connection kept dropping before they could speak to each other.  Doc. No. 105-1 at 8 (22:15–23:11).  When they did connect, Daniel was "frantic."  Id. (23:3).  Although Cheryl was not able to learn anything about what was happening at the scene before she left her house, id. (23:19–22), Daniel told her "get here" and "I need you," which she understood to mean that she "better get there because something . . . unusual was happening," id. (23:23–24:7).  She "could tell in Dan's voice that something wasn't good," and she asked where Brian was, to which Daniel replied, "Just get here."  Id. (24:11–14).

him he had contemplated using his Taser "because of the way [Brian] was acting."  Doc. No. 105 ¶ 68; Doc. No. 105-8 at 10 (78:9–79:4).

Brian, standing on the other side of the truck, began disrobing and eventually became naked.  Doc. No. 105 ¶ 20; Doc. No. 94-3 at 43–44 (70:6–71:21).  Brian proceeded to run around the truck, including into the right travel lane, while Daniel or Browning pursued him back to the passenger side.  Doc. No. 105 ¶ 29; Doc. No. 94-3 at 31 (39:10–23).  At this time, Browning did not try to physically restrain Brian because, Browning says, he was "afraid" that Brian "might get violent with" him and he was "trying to give [Cheryl] some time to get there."  Doc. No. 105 ¶ 29; Doc. No. 94-3 at 32 (40:3–15).

Around the time Brian began undressing, Browning radioed for backup, advising that he needed assistance with an individual with a "mental issue."  Doc. No. 105 ¶ 31; Doc. No. 94-3 at 31, 39 (39:2–12, 55:3–12).  Approximately two minutes later, Trooper Jeffrey Bermani arrived on scene.  Doc. No. 105 ¶ 33; Doc. No. 105-7 at 2.  Bermani pulled his duty vehicle behind Daniel's truck and angled it into the right traffic lane to divert traffic into the left lane.  Doc. No. 105 ¶ 32; Doc. No. 94-4 at 14–15 (27:13–28:6).  Bermani saw Browning, Daniel, and Brian standing on the sidewalk near the guardrail; Daniel was holding Brian, Brian was resisting his father's restraint, and Browning was not attempting to restrain Brian.  Doc. No. 105 ¶¶ 35–36; Doc. No. 94-4 at 15–18 (28:18–22, 29:5–22, 30:24–31:4).  Browning briefly walked toward Bermani, with his back to Daniel and Brian, as Bermani approached.  Doc. No. 105 ¶ 34; Doc. No. 94-4 at 19–21 (32:16–34:7).

Bermani visually recognized Brian as a person with Down syndrome and observed that he was small in stature.[6]  Doc. No. 105 ¶ 30; Doc. No. 94-4 at 18–19 (31:5–15, 32:6).  Bermani testified that he and Browning were letting Daniel handle the situation at that time because, based on his training and experience,[7] parents "typically . . . know the best way to handle their children with disabilities."  Doc. No. 105 ¶ 70; Doc. No. 94-4 at 19, 22 (32:6–7, 35:1–16).  Bermani learned at some point that Cheryl was "on her way to help" and, while Bermani did not know exactly what Cheryl would do, Bermani noted that "sometimes one parent is better with the child than the other."  Doc. No. 105 ¶¶ 34, 70; Doc. No. 94-4 at 23 (36:5–12).

Within a minute or two of Bermani's arrival, the troopers told the Corbetts to get back into Daniel's truck; Daniel got Brian into the vehicle and joined him inside.  Doc. No. 105 ¶¶ 21, 37; Doc. No. 94-4 at 24–25 (37:16–38:4).  Brian remained agitated, crawling between the front and back seats, as well as combative, pinching and slapping Daniel.  Doc. No. 105 ¶ 38; Doc. No. 94-4 at 25 (38:4–16); Doc. No. 105-4 at 11 (74:12–13, 75:17–24).  Browning told Daniel to exit the vehicle, which Daniel did, leaving Brian alone and unclothed in the truck.  Doc. No. 105 ¶ 39; Doc. No. 94-4 at 28–29 (41:24–42:1); Doc. No. 105-4 at 11 (76:5–6); Doc. No. 105-8 at 5–6 (44:19, 46:9–14).

Around this time, Troopers Gary Sacco and Christopher Goodwin arrived on scene.  Doc. No. 105 ¶ 32; Doc. No. 105-8 at 4 (35:21–24, 36:18–22); Doc. No. 105-10 at 5, 7 (16:18–17:1, 24:1–4); see also Doc. No. 105-7 at 2 (Sacco and Goodwin arrived three and five minutes after

---

[6] Another trooper likewise testified that it was "obvious" when he arrived on scene that Brian was disabled.  Doc. No. 105 ¶ 30; Doc. No. 105-8 at 5 (43:20–44:10).

[7] Bermani explained that, at the police academy, he received "training relating to dealing with people with disabilities" and was taught to "[t]ry to talk to them, defer to the parents, and have an ambulance come."  Doc. No. 94-4 at 28 (41:11–18).  Bermani also has a relative with Down syndrome.  Id. at 19, 27–28 (32:6–7, 40:13–41:10).

Bermani, respectively).  Sacco parked his vehicle in the right travel lane at a forty-five-degree

angle, about forty feet behind Daniel's truck, to divert traffic into the left travel lane and away

from the activity.  Doc. No. 105 ¶ 32; Doc. No. 105-10 at 5–6 (17:24–19:7, 19:22–20:9).  After

Browning filled him in, Sacco radioed to request an EMS dispatch.  Doc. No. 105 ¶ 79; Doc. No.

94-15 ¶ 10; see also Doc. No. 105-13 (ambulance dispatched approximately four minutes after

Sacco's arrival on scene).

Daniel and the four troopers remained outside the truck with Brian inside while they

waited for Cheryl and the ambulance to arrive.[8]  Doc. No. 105 ¶ 80.  Brian threw coffee cups and

other items out of the driver's side window.  Id. ¶ 40.  Bermani opened a door, removed the key

from the vehicle, and shut the door.[9]  Id. ¶ 82.  Sacco held the passenger door shut so that Brian

could not open it.  Id. ¶ 81; Doc. No. 94-5 at 20, 22 (22:18–19, 24:5–12); see also Doc. No. 105-

10 at 8 (27:11–13).  Sacco radioed again to "get the status of EMS."  Doc. No. 105 ¶ 83; Doc.

No. 94-15 ¶ 14.  According to Goodwin, the troopers' efforts to keep Brian in the vehicle

involved "t[elling] him to stay in the truck, calm down."  Doc. No. 105-8 at 10 (78:1–2); see also

id. at 12 (89:9–16) ("Probably just had our hands up, you know, stay in the vehicle, you know,

relax, calm down, you know, stop.").

---

[8] Bermani testified that while Brian was in the truck alone, the troopers were "waiting for the
mother to arrive and the ambulance" and that Bermani tried to calm Brian down by telling him
that his mother was coming.  Doc. No. 94-4 at 26–27 (39:8–9, 39:24–40:2).  Browning testified,
> We were originally leaving [Brian] in the truck because at this point the truck had
> been shut off, there was nobody in the truck, we were waiting on the ambulance to
> get there, and possibly his mother who we were still waiting on to see if, you know,
> she could be able to help out the situation.

Doc. No. 105-4 at 12 (79:1–4).

[9] Bermani testified that he opened the passenger door and retrieved the keys from the car's
ignition, and the truck may have been running at the time.  Doc. No. 94-4 at 29, 31 (42:6–22,
44:1–21).  According to Sacco, Bermani opened the driver's side door (not the passenger door)
to retrieve the keys from a cup holder (not the ignition).  Doc. No. 94-5 at 23 (25:17–24).  Sacco
"believe[d] . . . the vehicle was already off" at the time.  Id.

What happened next is the heart of this lawsuit.  The basic facts are largely undisputed, though the troopers' accounts vary as to some of the finer details.  The Court recites the facts in the light most favorable to the plaintiff.

The driver's side window was partially open.  Doc. No. 105 ¶ 41; Doc. No. 94-4 at 32 (45:9).  Brian started to come out of the window; the record does not establish exactly how far out Brian came on his own.[10]  Doc. No. 105 ¶ 41.  Browning said to the other troopers, "We'll just take him down into custody."  Doc. No. 105 ¶¶ 43, 44; Doc. No. 105-8 at 8 (71:22–24, 72:2–24).  The troopers did not discuss rolling up the window, nor did they attempt to do so.  Doc. No. 105 ¶ 44; Doc. No. 105-8 at 10, 12 (78:4–8, 87:20–88:17).  Goodwin and Bermani grabbed Brian by the arms as they, in Bermani's words, "pull[ed] him out of the window."  Doc. No. 105 ¶ 45; Doc. No. 94-4 at 41 (54:10–11).  Goodwin and Bermani took Brian, who remained naked, to the ground face-down.[11]  Doc. No. 105 ¶ 45; Doc. No. 94-4 at 32, 37 (45:15–18, 50:12–18).  The parties offer competing characterizations of this interaction.  The troopers contend that they "guided" Brian out of the truck window and then "escorted" him to the ground.  Doc. No. 105 ¶ 45.  Plaintiff says they "grabbed" and "pulled" Brian before "forc[ing]" him to the ground.  Id.; see also Doc. No. 105-8 at 8–9 (73:3–9, 74:19–23) ("grabbed" Brian after "fighting with him to stay in the vehicle"); Doc. No. 94-4 at 41 (54:10–11) ("pull[ed] [Brian] out of the window").

---

[10] Goodwin testified that the troopers took Brian to the ground "when [Brian] came out the window and most of his body was out the window," though his testimony does not elucidate how far out Brian was when the troopers first grabbed him by the arms.  Doc. No. 105-8 at 9 (77:14–22).  Browning testified that Brian "was coming out head first and he was about to actually drop and fall to the ground[] [a]nd the troopers just basically took him out."  Doc. No. 105-4 at 12 (78:20–23).  Sacco, who watched through the passenger window, testified that Brian "basically leap[ed] out the driver's window" and the troopers "basically shielded him from falling out of the window."  Doc. No. 105-10 at 8 (26:7–13).

[11] Goodwin explained that, after the troopers "were unsuccessful" in "fighting with [Brian] to stay in the vehicle," Goodwin and Bermani "grabbed him, went down to the ground with him and that's when he was handcuffed."  Doc. No. 105-8 at 8–9 (73:3–9, 74:19–23).

Once Brian was on the ground, Goodwin and Bermani grabbed Brian's wrists and used a compliance technique to force his arms and wrists behind his back at ninety-degree angles, then put Brian in handcuffs.[12]  Doc. No. 105 ¶¶ 43, 45; Doc. Nos. 94-12, 94-14; Doc. No. 94-4 at 36–37 (49:19–50:9); Doc. No. 105-8 at 9–10 (75:1–77:3, 81:1–10).  Meanwhile, Sacco held Brian's feet down to prevent him from kicking.  Doc. No. 105 ¶ 85; Doc. No. 105-10 at 9 (30:1–13).  The troopers did not try any other way of holding Brian before placing him in a compliance hold.  Doc. No. 105-8 at 9 (77:10–13).  Instead, the troopers "went to the ground with him" right away.[13]  Id. at 8–9 (73:1–9, 77:14–22).  Brian said he was "scared" when he was placed in handcuffs.[14]  Doc. No. 105 ¶ 46; Doc. No. 105-8 at 10 (81:18–21).  Once Brian was handcuffed,

---

[12] Bermani and Goodwin completed use-of-force reports disclosing their use of contact controls and handcuffs.  Doc. No. 105 ¶¶ 71, 75; Doc. Nos. 94-12, 94-14.

[13] Bermani's testimony is somewhat different.  He says that, once Brian was out of the vehicle standing upright, he and Goodwin continued to hold Brian by his arms.  Doc. No. 94-4 at 33–34 (46:15–47:11).  Brian resisted their restraint by "becoming rigid, tensing his muscles, and pulling his arms away."  Doc. No. 94-13 at 3.  Brian also tried to "push his body through" Bermani, Goodwin, and Daniel and toward traffic, which by this time was diverted out of the right traffic lane but was not altogether stopped.  Doc. No. 105 ¶¶ 44–45; Doc. No. 94-13 at 3; Doc. No. 94-4 at 34 (47:2–15); Doc. No. 105-10 at 9 (30:17–21).  Bermani testified that it was only after the troopers had tried holding Brian and he had resisted their restraint that they brought him to the ground.  Doc. No. 94-4 at 32, 37–38 (45:13–18, 50:14–51:3); see also Doc. No. 94-13 at 3.  Bermani's testimony is in some tension with Goodwin's statements that the two troopers grabbed Brian by the arms and took him to the ground without trying other ways of holding him.

[14] Bermani testified that Brian "immediately" became complaint "[a]s soon as he got his handcuffs on."  Doc. No. 105 ¶ 46; Doc. No. 94-4 at 32 (45:18–20).  When considered against the balance of the deposition testimony, Bermani's characterization of Brian's "immediate[]" compliance once handcuffed strains credulity.  Brian had, by all accounts, been anxious, agitated, and combative over the past fifteen minutes or more.  Goodwin testified that Brian began to calm down at some point later, whether when the ambulance arrived, when Brian was on the gurney, or when Cheryl (his mother) arrived.  Doc. No. 105-8 at 11 (83:21–84:6).  Sacco testified that Brian calmed down once he was in the EMTs' care.  Doc. No. 105-10 at 9 (31:9–13).  The EMT reported that Brian screamed that the handcuffs hurt him.  Doc. No. 105-13 at 4.  Cheryl testified that, when she arrived, she found a distraught Brian in the ambulance "whining like a puppy dog" and saying he was "scared."  Doc. No. 105-1 at 10 (30:13–21).  In light of the foregoing, a reasonable jury drawing all reasonable inferences in Plaintiff's favor could reject Bermani's assertion, if material, that Brian—naked and presumably still somewhat covered with feces—

the troopers sat him up.  Doc. No. 94-13 at 3.  The interaction "happened very quickly."  Doc. No. 105 ¶ 45; Doc. No. 105-10 at 8 (28:23).

As or just after the troopers handcuffed Brian, the ambulance arrived—roughly nine minutes after Sacco had first requested an EMS dispatch.  Doc. No. 105 ¶ 47; Doc. No. 105-4 at 13 (92:18–23); Doc. Nos. 105-7, 105-13.  Brian got onto or was placed on a gurney and was taken into the ambulance.  Doc. No. 105 ¶ 47.  The paramedic heard Brian scream that the handcuffs hurt him.  Doc. No. 105 ¶ 46; Doc. No. 105-13 at 4.

Cheryl arrived as, or just after, Brian was placed on the gurney.  Doc. No. 105 ¶ 53; Doc. No. 105-6 at 11 (54:15–17).  She saw the ambulance and ran toward it looking for Brian.  Doc. No. 105-1 at 9 (25:20–26:2).  A trooper, apparently Browning,[15] approached Cheryl and said: "[B]efore you see [Brian], I just want you to know that we're going to arrest him."  Doc. No. 105 ¶ 44; Doc. No. 105-1 at 9 (26:1–9).  When Cheryl asked what for, Browning replied, "Assault." Doc. No. 105 ¶ 44; Doc. No. 105-1 at 9–10 (26:1–9, 29:1–5).  Cheryl and Daniel told Browning that Daniel would not press charges and that Cheryl wanted to take Brian home.  Doc. No. 105 ¶ 44; Doc. No. 105-1 at 9 (26:13–21).  Browning replied that their only option, other than arrest, was to allow Brian to be transported to the hospital.  Doc. No. 105 ¶ 44; Doc. No. 105-1 at 9 (26:22–24).  Browning testified that he would not have let Cheryl take Brian home from the scene.[16]  Doc. No. 105 ¶ 44; Doc. No. 105-4 at 14 (95:24–96:17).

---

ceased displaying signs of anxiety, agitation, or combativeness immediately upon having metal handcuffs placed on his wrists.

[15] Cheryl did not know the name of the trooper with whom she spoke.  Doc. No. 105-1 at 9 (26:4, 27:20–28:3).  Browning recounted a similar conversation he had with Cheryl and Daniel.  Doc. No. 105-4 at 14 (95:12–96:17).  Goodwin heard Browning tell Cheryl that it was "domestic assault at that point."  Doc. No. 105-8 at 11 (82:7–23).

[16] Browning's account of this conversation is somewhat different.  Which version of this interaction to credit at trial—Cheryl's or Browning's—is a question for the jury.  According to Browning, he told Cheryl:

Cheryl then went to the ambulance, where she found Brian inside "on the stretcher, handcuffed[,] . . . [and] whining like a puppy dog." Doc. No. 105 ¶ 44; Doc. No. 105-1 at 10 (30:13–15). Brian kept repeating "scared" while Cheryl tried to reassure him. Doc. No. 105 ¶¶ 44, 55; Doc. No. 105-1 at 10 (30:17–21). In all, Brian was handcuffed for fifteen to twenty minutes, and the cuffs were removed before the ambulance transported him to the hospital.[17] Brian was treated for abrasions and contusions to his knees and right shoulder as well as associated pain. Doc. No. 105 ¶¶ 48, 59; Doc. No. 94-10 at 5, 12. He was discharged from the emergency department about an hour after his arrival. Doc. No. 94-10 at 7–11.

The incident has had a lasting effect on Brian's quality of life. Doc. No. 105 ¶ 61. See generally Doc. Nos. 105-3, 105-12. Brian became reluctant to ride in cars and refused to get into Daniel's truck. Doc. No. 105 ¶ 61; Doc. No. 105-1 at 6 (14:14–15:7). When his family tries to get him to leave the house, Brian sometimes will yell, "No handcuffs" and "No Route 1." Doc. No. 105 ¶ 61; Doc. No. 105-3 ¶¶ 6–7. Whereas Brian was previously "happy-go-lucky" and a

---

I said we're not arresting him, I said, even though we could. And she goes oh, what could you arrest him for? I said well, he could go for domestic assault. She says he wouldn't press charges, referring to her husband. I told her well, it's in the presence of a law enforcement officer, he doesn't have to press charges. I said we're not going to arrest your son. We understand the situation here.

Doc. No. 105-4 at 14 (95:12–20). Whether the facts recounted above constituted domestic assault on Daniel—let alone a case a prosecutor would have charged or for which a jury would have convicted—is beyond the scope of this opinion.

[17] The record does not establish how long Brian was handcuffed, but this estimate is the longest duration supported by the summary-judgment record. The ambulance arrived at 8:55 a.m., reached Brian at 8:56 a.m., and left the scene at 9:13 a.m. Doc. No. 105-13 at 3. The troopers handcuffed Brian before or just as the ambulance arrived. Doc. No. 105-4 at 13 (92:18–23). Cheryl testified that Brian was cuffed inside the ambulance when she arrived. Doc. No. 105-1 at 10 (30:13–15). According to the EMT report, the paramedic asked the troopers to remove the handcuffs because Brian was "screaming they hurt," the officers removed the cuffs before Brian was transported, and the paramedic was able to control Brian's hands during the transport to the hospital. Doc. No. 105-13 at 4. If Brian was handcuffed from a minute before the ambulance arrived until just before it departed, he was handcuffed for nineteen minutes.

"social butterfly" who "wanted to be out" accompanying his family on errands or to his relatives' sporting events, since the incident he "wants to just stay home."  Doc. No. 105 ¶ 61; Doc. No. 105-1 at 7–8, 11, 14–15 (18:6–18, 20:22–21:6, 51:16–52:10, 63:10–12, 67:19–68:4); Doc. No. 105-2 at 4 (15:18–16:11).  Staff from the day program Brian attends noted, about six months after the incident, that Brian "ha[d] not been the same since."  Doc. No. 105 ¶ 61; Doc. No. 105-2 at 2.  Brian receives treatment from a therapist and a behavioralist to help him manage his anxiety, and he began taking medication for anxiety and post-traumatic stress disorder (PTSD) after the trooper encounter.  Doc. No. 105 ¶ 61; Doc. No. 105-1 at 11–13 (52:11–55:8, 58:16–60:7); Doc. No. 105-3 ¶ 10; see also 94-10 at 18–19.  Cheryl testified that the "whole thing stems back from when [the troopers] handcuffed him."  Doc. No. 105 ¶ 61; Doc. No. 105-1 at 15 (67:21–22).

### B.    Procedural History

Daniel Corbett filed suit in his capacity as Brian's guardian on September 13, 2022.[18] Doc. No. 1.  The Third Amended Complaint asserts five claims against Troopers Browning, Bermani, Goodwin, and Sacco: false arrest (Count I) and excessive force (Count II) in violation of Brian's constitutional rights (brought under 42 U.S.C. § 1983); intentional infliction of emotional distress (Count V); assault and battery (Count VI); and violation of the Massachusetts Equal Rights Act (Count VII).[19]  Doc. No. 81 ¶¶ 50–57, 62–77.  It also brings a § 1983 failure-to-intervene claim against Bermani, Goodwin, and Sacco (Count IV).  Id. ¶¶ 58–61.

---

[18] Jenna Freeman was substituted as the plaintiff when Daniel became gravely ill in April 2024. Doc. Nos. 77, 78.

[19] The Court dismissed the Americans with Disabilities Act claim against the Commonwealth of Massachusetts (Count III).  Doc. No. 73.  The parties agreed to dismiss with prejudice claims against a fifth trooper, Caden Tibert.  Doc. No. 79.

On April 15, 2025, the defendants moved for summary judgment on all counts.  Doc. No. 94.  They assert entitlement to qualified immunity on Plaintiff's constitutional claims.  Id. at 20–21.  Plaintiff opposed with respect to the § 1983 excessive-force claim and the state-law claims.  Doc. No. 104.  The Court held a hearing on February 9, 2026.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'"  Barbour v. Dynamics Rsch. Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  The Court is "obliged to []view the record in the light most favorable to the nonmoving party"—here, Plaintiff—"and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation."  Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (citation modified).  A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III.    DISCUSSION

### A.    Section 1983 Claims

Having not opposed summary judgment with respect to the false-arrest and failure-to-intervene claims, see Doc. No. 104, Plaintiff has abandoned those claims.  Counsel

acknowledged as much at the motion hearing.  The motion for summary judgment is therefore ALLOWED as unopposed as to Counts I and IV.

Plaintiff's remaining § 1983 claim is premised on the notion that, by taking Brian to the ground and handcuffing him, the defendants used excessive force in violation of the Fourth Amendment.  Doc. No. 104 at 16–18.  The troopers assert entitlement to qualified immunity on this claim.  Doc. No. 96 at 20–21.  The parties do not disaggregate the excessive-force claims as to each individual trooper, instead arguing that their liability rises or falls together.  For purposes of summary judgment, the Court follows suit.

"The doctrine of qualified immunity protects government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Guillemard–Ginorio v. Contreras–Gómez, 585 F.3d 508, 526 (1st Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity "shields an officer from a section 1983 claim unless the officer (1) violated a federal statutory or constitutional right; and (2) the unlawfulness of the officer's[] conduct was clearly established at the time of the alleged misconduct."  Conlon v. Scaltreto, 158 F.4th 211, 219 (1st Cir. 2025) (citation modified).  "[I]f a reasonable official would not have understood that his conduct violated Plaintiff['s] constitutional rights, [the Court] must grant him qualified immunity."  Estrada v. Rhode Island, 594 F.3d 56, 63 (1st Cir. 2010).

The Court first considers whether, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that the troopers used unconstitutionally excessive force.  It then considers whether the troopers are nevertheless entitled to qualified immunity.[20]

---

[20] The Court acknowledges that it has discretion to address either stage of the two-part analysis first.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).  It proceeds in this manner, in part, because Plaintiff's assault-and-battery claim rises and falls with the excessive-force analysis.

To prevail on an excessive-force claim, "a plaintiff must show that the defendant employed force that was unreasonable under all the circumstances."[21] Gray v. Cummings, 917 F.3d 1, 8 (1st Cir. 2019) (citation modified).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989); see also id. at 396–97 (emphasizing that officer's subjective motivations have "no bearing" on reasonableness analysis).  Whether a particular use of force was objectively reasonable under the totality of the circumstances requires "the weighing of a myriad of factors such as 'the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight.'" Gray, 917 F.3d at 8 (quoting Graham, 490 U.S. at 396).

The three Graham factors are "not exhaustive," nor are they equally apt in every use-of-force situation.  See Lachance v. Town of Charlton, 990 F.3d 14, 26 (1st Cir. 2021) (applying Graham factors while noting they are "geared toward criminal suspects as opposed to persons who are suspected only of experiencing a medical emergency for which they require aid" (citing Est. of Hill ex rel. Hill v. Miracle, 853 F.3d 306, 313 (6th Cir. 2017))).  Other relevant considerations may include whether "a warning was given before the use of force and whether the suspect complied with this demand," whether the suspect was armed or believed to be armed,

---

[21] Defendants seem to suggest their seizure of Brian was constitutional because the troopers were acting in a community-caretaking capacity.  Doc. No. 96 at 11.  This argument misses the mark. Whatever the scope of the community-caretaking doctrine, see Caniglia v. Strom, 593 U.S. 194 (2021)—and to the extent it is relevant at all to the troopers' efforts to take Brian "down into custody"—it does not give officers carte blanche to use excessive force.  Cf. Brigham City v. Stuart, 547 U.S. 398, 403 (2006) ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness' . . . .").

whether the suspect was "escalating the situation," the suspect's "physical proximity to the officers," and "whether multiple officers simultaneously reached the conclusion that a use of force was required."  Bannon v. Godin, 99 F.4th 63, 78 (1st Cir. 2024) (citation modified).  The "severity of the injury" sustained may suggest whether excessive force was used, but serious injury is "not a prerequisite" to an excessive-force finding.  Bastien v. Goddard, 279 F.3d 10, 14 (1st Cir. 2002) (citing Dean v. City of Worcester, 924 F.2d 364, 369 (1st Cir. 1991); Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 353 n.11 (1st Cir. 1995)).  The Court uses the Graham framework while considering the uses of force in the totality of the circumstances.

The Court of Appeals has instructed that, "when circumstances relevant to the reasonableness inquiry changed between one use of force and another," courts should consider separately each distinct use of force.  Lachance, 990 F.3d at 26–27 & nn.10–11.  When the material circumstances remain unchanged, a court need not employ a "segmented approach"— and in any event the court may "look at the totality of the uses of force . . . and determine that there was a constitutional violation."  Id. at 26 n.10.

This incident involved several uses of force occurring in quick succession, which began when Browning told the other troopers to "just take [Brian] down into custody."  Doc. No. 105-8 at 8 (71:22–24, 72:2–24).  As an unclothed Brian came out the truck window, Bermani and Goodwin grabbed his arms and took him face-down to the ground.  Bermani and Goodwin then forced Brian's arms behind his back and forcibly positioned his arms and wrists into ninety-degree angles for a compliance hold.  Sacco held Brian's feet to the ground.  Bermani and Goodwin then handcuffed Brian, and he remained handcuffed for roughly fifteen minutes.  Viewing the record in the light most favorable to Plaintiff, the troopers decided to take Brian "into custody" when he emerged from the truck window, and the troopers' subsequent actions

were an integrated course of conduct leading to Brian's handcuffing.  Accordingly, the Court

considers the reasonableness of the "totality" of the uses of force; for the sake of completeness, it

also considers the reasonableness of each use of force where the "relevant circumstances" varied

between them.  See Lachance, 990 F.3d at 26–27 & nn.10–11.

The first Graham factor favors Plaintiff.  "When the subject of a seizure has not

committed any crime, the first Graham factor ordinarily cuts in the subject's favor."  Gray, 917

F.3d at 8 (citing Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 899 (4th

Cir. 2016)).  Although Browning first pulled over because he saw a physical altercation between

Brian and Daniel, Daniel promptly informed Browning that Brian was his son who had Down

syndrome and was in distress, and that Daniel was trying to help Brian get back into the truck.

When Browning radioed for backup, he requested assistance with a person with a "mental issue,"

not someone who had committed an assault or any other crime.  When the other troopers arrived

on scene, they promptly learned what Browning knew: that Brian had Down syndrome, that he

was agitated due to his bathroom accident, and that Daniel and the troopers were trying to

manage Brian until his mother (Cheryl) or the ambulance could arrive.  This strategy—talking to

Brian, deferring to Daniel, waiting for Cheryl or the ambulance—accorded with Bermani's

training for dealing with a disabled person.  Doc. No. 94-4 at 28 (41:11–18).  Presumably, all the

troopers had similar training.  Finally, although Browning later told Cheryl that he would or

could charge Brian with domestic assault, he never charged Brian with any crime.  Cf. Gray, 917

F.3d at 7, 9 (first factor weighed in subject's favor even though she was charged with "assault on

a police officer, resisting arrest, disturbing the peace, and disorderly conduct" as charges were

dropped and facts did not support "assault" characterization).  Because Brian had committed no

17

crime,[22] the first factor—"the severity of the crime at issue," Graham, 490 U.S. at 396—weighs

"heavily" in Brian's favor.  Est. of Armstrong, 810 F.3d at 899; see also Turmon v. Jordan, 405

F.3d 202, 207 (4th Cir. 2005) ("[T]he severity of the crime cannot be taken into account because

there was no crime." (citation modified)).

The second factor—whether "a reasonable officer on the scene could believe" Brian

"pose[d] an immediate threat to the safety of the officers or others," Bannon, 99 F.4th at 78;

Graham, 490 U.S. at 396—also weighs in Plaintiff's favor, although the relevant considerations

differ slightly as to each use of force.  Nothing in the record suggests Brian, who was undressed

at all relevant times, had or was believed to have a weapon at any point.  See Bannon, 99 F.4th at

78.  When Brian was alone in the vehicle without the keys, he posed no risk of harm to anyone

but himself.  As he began to exit the vehicle through the driver's side window, he continued to

pose an immediate danger only to himself.  On Goodwin's version of events, that was the

moment when the troopers grabbed Brian's arms and took him to the ground.

Even if Brian would have conceivably posed a danger to others if he had gotten fully out

of the vehicle and then had run toward traffic, several factors substantially mitigated that hazard

(or so a reasonable jury could conclude).  First, the troopers had diverted traffic into the left-most

lane by parking their vehicles in the right travel lane.  That created a larger buffer zone around

the truck, which was parked in the breakdown lane.  Second, the troopers had a "distinct height

and weight advantage"—Browning alone was a foot taller and weighed twice as much as Brian.

See Gray, 917 F.3d at 6, 9 (recognizing "distinct height and weight advantage" when officer was

---

[22] To the extent Brian's physical interactions with Daniel constituted assault—a conclusion reached only if one views the record in a light favorable to the defendants, which the Court does not do at summary judgment—the first factor nevertheless weighs in Plaintiff's favor because that crime, if it occurred, was a minor one.  See Gray, 917 F.3d at 8 (citing Est. of Armstrong, 810 F.3d at 899–900).

five inches taller and fifty percent heavier than subject).  Third, Brian was outnumbered: there were at least four troopers on scene at the time, in addition to Brian's father.  Finally, if Brian was coming face-first out of the vehicle, he was not physically positioned to evade the troopers' hold and run into traffic.  These considerations suggest the troopers had other, less forceful tools at their disposal—such as getting Brian back into the truck, encircling Brian against the truck, holding his arms, or securing him against the truck—that could have minimized any risk of harm Brian posed to himself or passersby.  In light of all these factors, a jury could reasonably find that, at the time the troopers took Brian to the ground, he did not "pose[] an immediate threat to the safety of the officers or others."  Graham, 490 U.S. at 396; see also Gray, 917 F.3d at 9 (second factor weighed in subject's favor because she "only posed a danger to herself").

Once the troopers had Brian on the ground, the potential threat he posed to others was minimal.  Sacco held Brian's ankles to prevent him from harming himself by kicking the pavement or harming others.  Doc. No. 105-10 at 9 (30:1–13).  Nevertheless, the troopers forced his arms into a compliance-hold position and placed him in handcuffs for about fifteen minutes.  Because the threat Brian posed diminished to a vanishing point over the course of these events, the second factor weighs in Plaintiff's favor.

The record on the third factor—whether Brian was "actively resisting arrest or attempting to evade arrest by flight," Graham, 490 U.S. at 396—is mixed.  Even viewing the record in the light most favorable to Plaintiff, Brian was highly agitated and was not abiding by the troopers' instructions to remain in the truck.  But—viewed in that light—Brian's conduct when the troopers took him to the ground could reasonably be considered distressed noncompliance rather than active resistance.  According to Goodwin, the troopers took Brian to the ground when he emerged out of the truck window.  There is no evidence that the troopers warned Brian that they

19

would take him to the ground or handcuff him before they did so.  See Bannon, 99 F.4th at 78.

Nor is there evidence as to the amount of time the troopers struggled with Brian before taking

him down, aside from Sacco's testimony that the encounter transpired very quickly.  Once they

had Brian on the ground, the officers proceeded immediately to employing the compliance

technique and handcuffs without additional verbal commands.  The record therefore suggests the

troopers did not solicit Brian's compliance anew before the takedown, compliance hold, and

handcuffing.  Cf. Velez v. Eutzy, 152 F.4th 292, 303 (1st Cir. 2025) (noting "escalating force

deployed . . . without pause or warning" following "passive" resistance and absence of additional

orders or conversation tended to show force was unreasonable).  Because a reasonable jury could

conclude that Brian was not "actively resisting arrest or attempting to evade arrest by flight,"

Graham, 490 U.S. at 396, the third factor weighs somewhat in Plaintiff's favor.

Considering the totality of the circumstances, Plaintiff has made a sufficient showing that

the troopers' uses of force to take Brian "down into custody"—taking Brian to the ground,

forcing his arms into a compliance hold, and handcuffing him for fifteen minutes—were

unreasonable in violation of the Fourth Amendment.[23]  Of course, after a trial, a jury could reach

a different conclusion.

Although the Court concludes that a reasonable jury could find the troopers used

excessive force, the doctrine of qualified immunity shields from liability "all but the plainly

---

[23] Brian yelled that the handcuffs "hurt" him.  He was treated for abrasions and contusions to his knees and shoulder as well as for pain.  He has since received treatment (therapy and medication) related to anxiety and PTSD.  These physical and psychic injuries do not undermine the Court's conclusion that the troopers used excessive force.  See Bastien, 279 F.3d at 14–15; cf. Davis v. Rennie, 264 F.3d 86, 111 (1st Cir. 2001) ("[A] mental patient [need not] sustain physical injuries to prevail on a claim that he was the victim of unreasonable restraint through the use of excessive force. . . . Davis suffered PTSD as a result of the restraints at issue in this case. . . . The jury thus could have attributed some of Davis's mental injury to Rennie's use of excessive force . . . .").

incompetent or those who knowingly violate the law." City of Tahlequah v. Bond, 595 U.S. 9, 12 (2021) (per curiam) (citation modified). Whether the unlawfulness of an officer's conduct was "clearly established" has two components: "whether (a) there is controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm; and (b) an objectively reasonable officer would have known that his conduct violated the clearly established law in the circumstances he faced." Conlon, 158 F.4th at 219 (citation modified). Here, the question is whether it was clearly established, at the time of the events in this case, that the use of a takedown, compliance hold, and handcuffs to take a distressed adult with Down syndrome into custody on or near an active roadway constituted excessive force.[24] The answer is no.

Plaintiff cites no authority, controlling or persuasive, sufficient to put an officer on notice of this constitutional expectation. The only cases Plaintiff identifies are those involving the use of force on young children in school and domestic settings. See Doc. No. 104 at 19–20. The record shows the troopers knew Brian had Down syndrome and, based on their training and experience, they knew they should engage with Brian differently than they would a nondisabled adult. See also Gray, 917 F.3d at 11. But Plaintiff has not shown that clearly established law told the troopers to treat Brian as they would a child. Importantly, all of Plaintiff's cases differ materially from the present case in terms of the context in which force was used; none of them "comes close to establishing that the officers' conduct was unlawful." Bond, 595 U.S. at 13.

---

[24] The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." Bond, 595 U.S. at 12. "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (citation modified).

21

In E.W. ex rel. T.W. v. Dolgos, the Fourth Circuit determined that "handcuff[ing] a calm, compliant ten-year-old surrounded by multiple adults in a closed room [in an elementary school] for hitting another child three days earlier" was not objectively reasonable. 884 F.3d 172, 183–86 (4th Cir. 2018). The handcuffing in E.W. took place in an elementary school, a setting that "presents unique considerations not present when officers patrol the streets." Id. at 183. It also took place days after the underlying incident, whereas the present case involved force used during a rapidly unfolding situation. Unlike E.W., Brian was not "calm and compliant" at the time the officers used force. Id. at 181. And although Brian has certain childlike qualities and vulnerabilities,[25] he is physically larger and more developed than E.W. was. Contrast id. at 177 ("E.W. stood 4'4" and weighed about 95 pounds."), with Doc. No. 105 ¶ 4 (Brian is four feet, eleven inches tall and weighs about 130 pounds), and Doc. No. 105 ¶ 30 (Browning thought Brian was a teenager on first impression).

The other cases Plaintiff cites are likewise inapt. In Gray ex rel. Alexander v. Bostic, the Eleventh Circuit confronted a situation in which a school resource officer handcuffed a "compliant" nine-year-old in an elementary-school lobby, not for any safety reason but to "punish her and teach her a lesson" for speaking disrespectfully to her teacher. 458 F.3d 1295, 1307 (11th Cir. 2006). The child's age and demeanor, the school setting, and the officer's proffered justification all distinguish Gray from the present case. In Tekle v. United States, the Ninth Circuit concluded that federal officers used excessive force when they handcuffed an

---

[25] The E.W. court emphasized that "youth is an important consideration when deciding to use handcuffs during an arrest" in light of "the risk of lasting trauma among children exposed to the criminal justice system at young age." E.W., 884 F.3d at 182 & n.4. Plaintiff has not shown that the same general principle clearly applies to adults with Down syndrome, even though the record suggests Brian experienced similarly negative emotional and psychological consequences from the incident.

eleven-year-old boy in his family's driveway and then "fifteen to twenty officers kept their guns pointed at him" for an extended time while warrants related to the boy's father were executed. 511 F.3d 839, 843–48 (9th Cir. 2007). The child's age,[26] the degree of force used, the duration of the force, and the domestic setting all distinguish Tekle from this case. And C.B. v. City of Sonora, which involved "a decision by [police] officers to handcuff and remove from school grounds an 11-year-old child with attention-deficit and hyperactivity disorder . . . who was doing nothing more than sitting quietly and resolutely in the school playground" is—as that description makes clear—an inapt comparator here. 769 F.3d 1005, 1010 (9th Cir. 2014) (en banc).

Plaintiff also cites Gray v. Cummings, in which the First Circuit held that "the level of force that is constitutionally permissible in dealing with a mentally ill person differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community," and that "a subject's mental illness is a factor that a police officer must take into account in determining what degree of force, if any, is appropriate." Gray, 917 F.3d at 11 (citation modified). Here, the troopers knew Brian had Down syndrome and was agitated, and they had observed him in distress over the course of several minutes. Reasonable officers in their position would have known, per Gray, to take Brian's condition into account when determining how much force (if any) to use. But Gray itself does not clearly establish what degree of force is excessive once an officer accounts for a subject's mental illness—and Plaintiff cites no case law that would put the troopers on notice

---

[26] There is some indication that eleven-year-old Tekle may have appeared slightly older than his actual age to the officers, perhaps twelve or fourteen. Tekle, 511 F.3d at 845 & n.4. Even if that fact brings Tekle closer in physical appearance to Brian, the other factors discussed above make Tekle dissimilar from this case.

where that line is drawn or would establish that the troopers necessarily knew they had crossed that line.

Plaintiff has not carried the "heavy burden" of showing that the law was clearly established. Est. of Rahim ex rel. Rahim v. Doe, 51 F.4th 402, 410 (1st Cir. 2022) (quoting Lachance, 990 F.3d at 20). Nor was this a circumstance in which the officers' use of force was so egregiously excessive that its unlawfulness should have been apparent to any reasonable officer in the absence of precedent. Cf. Taylor v. Riojas, 592 U.S. 7, 9 (2020) (per curiam) ("Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that Taylor's conditions of confinement offended the Constitution."). Certainly, excessive force was used. But "the circumstances nonetheless present a close case on which reasonable officers might have concluded otherwise," Velez, 152 F.4th at 303, or at least the law did not clearly establish that the degree of force used was excessive under the circumstances.

Qualified immunity precludes liability on Freeman's excessive-force claim. The motion for summary judgment is therefore ALLOWED as to Count II.

### B.    Supplemental Jurisdiction

The Court's resolution of Plaintiff's § 1983 claims leaves only state-law claims. The Court has supplemental jurisdiction over the state-law claims, all of which share a common nucleus of operative fact with the federal claims. 28 U.S.C. § 1367(a). Where, as here, all federal claims have been dismissed, the Court "must exercise informed discretion when deciding whether to assert supplemental jurisdiction over state law claims." Redondo Constr. Corp. v. Izquierdo, 662 F.3d 42, 49 (1st Cir. 2011) (citation modified); see also 28 U.S.C. § 1367(c)(3). The relevant considerations include "concerns of comity, judicial economy, convenience, and fairness." Redondo Constr., 662 F.3d at 49. Here, those factors weigh in favor of this Court's exercise of supplemental jurisdiction. No party has asked the Court not to exercise supplemental

jurisdiction over the state-law claims.  The parties have litigated the present suit in federal court for more than three years; the federal and state law claims were closely interconnected; and the litigation has reached an advanced stage—discovery is complete, and the case is ready to proceed to trial on the remaining claims.  See id. at 49–50.  Comity considerations do not alter that balance.  Under the totality of the circumstances, the Court concludes that the interests of fairness, judicial economy, convenience, and comity are best served by the Court exercising supplemental jurisdiction.  28 U.S.C. § 1367.

> ### C.    Assault and Battery

"Massachusetts law allows for assault and battery claims against police officers who use excessive force in conducting an arrest."  Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010) (citing Powers v. Sturtevant, 85 N.E. 84, 84 (1908)).  "However, Massachusetts law also allows an officer to use reasonable force in conducting a lawful arrest: reasonable force is a valid defense to assault and battery."  Id. (citing Dean, 924 F.2d at 369).  "Where a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, [a court's] determination of the reasonableness of the force used under § 1983 controls [its] determination of the reasonableness of the force used under the common law assault and battery claims."  Id.; accord Velez, 152 F.4th at 300–01.  Because the Court determined above that a reasonable jury could conclude the troopers used excessive force under § 1983, it likewise determines that a reasonable jury could conclude the troopers committed common-law assault and battery.[27]

Defendants argue that the "police privilege" shields them from liability on Plaintiff's assault-and-battery claim.  Doc. No. 96 at 17–18.  But the "police privilege" Defendants rely on is just another way of saying that reasonable force is a valid defense to assault and battery.  Id.

---

[27] Again, the parties treat the defendants' conduct monolithically, and the Court follows suit for the purpose of the summary-judgment motion only.

("[T]he police privilege permits police officers to use reasonable and necessary force when carrying out their official duties[.]" (citing Commonwealth v. Asher, 31 N.E.3d 1055, 1062 (Mass. 2015)).  The Court has determined the use of force was unreasonable on the summary-judgment record, and it therefore rejects Defendants' police-privilege argument.

Defendants do not, however, argue that they are entitled to qualified immunity on Plaintiff's state tort claims.  See Doc. No. 96 at 20–21 (arguing for qualified immunity on federal constitutional claims).  Qualified immunity is therefore not a basis on which to grant summary judgment for the troopers on the assault-and-battery claim.[28]  Accordingly, the motion for summary judgment is DENIED as to Count VI.

> D.    Intentional Infliction of Emotional Distress

Plaintiff has not made a sufficient showing to survive summary judgment on the claim for intentional infliction of emotional distress ("IIED").  To make out an IIED claim under Massachusetts law, a plaintiff must show "(1) that [defendant] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014).  "Conduct qualifies as extreme and outrageous only if it goes beyond all possible bounds of decency, and is regarded as atrocious, and utterly intolerable in a civilized community." Id. (citation modified); accord Foley v. Polaroid Corp., 508 N.E.2d 72, 82 (Mass. 1987) (quoting Restatement (Second) of Torts § 46 cmt. d (A.L.I. 1965)).  But conduct that is "otherwise reasonable may become tortious when

---

[28] Massachusetts law governs immunities from claims arising under Massachusetts law.  Cf. Velez, 152 F.4th at 304 (resolving New Hampshire assault-and-battery claim on New Hampshire qualified-immunity grounds).  "Massachusetts law is unsettled regarding the existence of a state-law concept analogous to federal qualified immunity." Raiche, 623 F.3d at 40.  Because the defendants did not invoke a qualified-immunity defense to the state tort law claims, the Court need not address the existence or scope of qualified immunity under Massachusetts law.

directed at an individual known to be particularly susceptible to infliction of emotional distress."

Boyle v. Wenk, 392 N.E.2d 1053, 1056 (Mass. 1979) (citing Restatement (Second) of Torts § 46

cmt. f).  Emotional distress is "severe" if it is such that "no reasonable man could be expected to

endure."  Agis v. Howard Johnson Co., 355 N.E.2d 315, 319 (Mass. 1976) (quoting Restatement

(Second) of Torts § 46 cmt. j).

"The standard for IIED claims is very high."  Penate v. Sullivan, 73 F.4th 10, 23 (1st Cir.

2023) (citation modified); see also Kennedy v. Town of Billerica, 617 F.3d 520, 530 (1st Cir.

2010) ("[T]he Massachusetts cases are demanding.").  "In considering whether a plaintiff has

made out a claim for intentional infliction of emotional distress, . . . the trier of fact [may] put as

harsh a face on the defendant's actions as the basic facts would reasonably allow."  Roman v.

Trs. of Tufts Coll., 964 N.E.2d 331, 341–42 (Mass. 2012) (citation modified).

Even putting "as harsh a face on the [troopers'] actions as the basic facts would

reasonably allow," id., Plaintiff's IIED claim falters on the second element—a reasonable jury

could not conclude the troopers' conduct was "extreme and outrageous."  Although, viewed in

that light, the troopers knew Brian was "particularly susceptible" to emotional distress,[29] the

degree of force they used "in the face of such knowledge" was not "repugnant to the conscience

of the community."  Restatement (Second) of Torts § 46 cmt. f; Poy v. Boutselis, 352 F.3d 479,

485 (1st Cir. 2003).  Not every use of excessive force by law enforcement is extreme and

outrageous.  The Court has already explained that the troopers' conduct—even considering their

knowledge of Brian's vulnerabilities—was not so egregious as to put a reasonable officer on

---

[29] The troopers knew Brian had Down syndrome and a heart defect, and they had witnessed him in the throes of emotional distress over the course of several minutes.  Although the troopers may not have known the "precise nature" of Brian's susceptibility to emotional distress, their observations "put [them] on notice that [he] might be more vulnerable" to their exercise of force. Boyle, 392 N.E.2d at 1056.

notice that it violated Brian's constitutional rights in the absence of clearly established law marking that boundary. For largely the same reason, a reasonable jury could not conclude the troopers' conduct was "extreme and outrageous" as Brian's IIED claim would require.[30]

Because Plaintiff has not shown that a reasonable jury could find the officers liable for IIED, the motion for summary judgment is ALLOWED as to Count V.

### E.   MERA Claim

Finally, Plaintiff argues that the troopers violated Brian's rights under the Massachusetts Equal Rights Act ("MERA"), either by treating the manifestations of his disability as criminal activity or by failing to reasonably accommodate his disability. Doc. No. 104 at 11–16 (citing Mass. Gen. Laws ch. 93, § 103).

Plaintiff's MERA claim raises several novel and complex questions of state law. Plaintiff concedes that no Massachusetts case has yet addressed whether MERA applies to an ad hoc arrest context. Doc. No. 104 at 10. Although MERA has federal counterparts in Title II of the ADA and Section 504 of the Rehabilitation Act, see Shedlock v. Dep't of Corrs., 818 N.E.2d 1022, 1029–35 (Mass. 2004), federal law provides little guidance in this case for at least two reasons: (1) the First Circuit has not decided whether and how Title II applies to arrests, and (2) Title II would not apply here (i.e., in a damages action against individual line officers) but MERA plausibly might. See Conlon, 158 F.4th at 225–26; Shedlock, 818 N.E.2d at 1032 n.7. Massachusetts courts also appear not to have decided whether officers have qualified immunity against MERA claims.

---

[30] Because the Court concludes that the troopers' conduct was not extreme and outrageous as a matter of law, it need not consider whether Brian's emotional distress resulting from the incident was "severe."

The Court therefore cannot predict with any reasonable certainty how the Massachusetts Supreme Judicial Court ("SJC") would resolve Plaintiff's MERA claims using the typical predictive tools.  See, e.g., Ken's Foods, Inc. v. Steadfast Ins. Co., 36 F.4th 37, 44 (1st Cir. 2022); In re Engage, Inc., 544 F.3d 50, 58 (1st Cir. 2008).  The novel and complex legal questions presented by the MERA issue, which may be determinative of Plaintiff's claim, are appropriate candidates for certification to the SJC.  Mass. S.J.C. R. 1:03.  "[C]ertification is particularly appropriate where, like here, the answers . . . may hinge on policy judgments best left to the Massachusetts court and will certainly have implications beyond these parties."  Ken's Foods, 36 F.4th at 44 (citation modified).  The factual record in this case is well developed for the SJC's consideration.  See Back Beach Neighbors Comm. v. Town of Rockport, No. 20-cv-11274-NMG, 2021 WL 8939521, at *2 (D. Mass. Feb. 3, 2021).

The Court therefore concludes that certification to the SJC is necessary and appropriate. The Court intends to solicit the parties' input as to the specific questions certified.  A separate order addressing certification will issue.  The motion for summary judgment is DENIED WITHOUT PREJUDICE as to Count VII.

IV.   CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment (Doc. No. 94) is ALLOWED as to Counts I, II, IV, and V, DENIED as to Count VI, and DENIED WITHOUT PREJUDICE as to Count VII.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

29